HARRIS W. SEED AND NANCY C. SEED, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5592–67.    Filed August 28, 1969.

*Edward W. Schramm*, for the petitioners.
*Brice A. Tondre*, for the respondent.

OPINION

STERRETT, *Judge:* The facts have been fully stipulated by the parties; accordingly the proceeding was submitted under Rule 30 of the Court's Rules of Practice. The stipulated facts and the exhibits attached thereto are incorporated herein by this reference and are adopted as our findings of fact. A summary of the pertinent facts is set forth below.

The respondent determined a deficiency in the petitioners' income tax for the calendar year 1964 of $3,385.29. The petitioners concede that their tax liability for 1964 was understated by $2,547.08 due to a mathematical error. The amount remaining in contention is thus $838.21.

At the time of filing their petition Harris W. Seed and Nancy C. Seed (hereinafter referred to as petitioners) were residents of Santa Barbara, Calif. Petitioners were at all times material herein husband and wife and filed a joint Federal income tax return for 1964 with the district director of internal revenue in Los Angeles, Calif.

Petitioner Harris W. Seed is an attorney at law admitted to practice in the State of California. He was actively engaged in the practice of law in 1964 and has been so engaged since 1953. Petitioner Nancy C. Seed was not engaged in income-producing activities during the taxable year 1964. Neither petitioner was connected with a savings and loan business, other than as stipulated, during 1964 or prior years. Harris W. Seed has, however, participated as an investor in numerous businesses in the years from 1955 to the present.

In late 1962 two businessmen in Santa Barbara, Calif., Jerome W. Levy and Michael Towbes, discussed among themselves the possibility of establishing a savings and loan association in Goleta, Santa Barbara County, Calif. After several discussions Mr. Towbes contacted Robert M. Shafton of the law firm of Greenberg, Shafton and Bernhard to determine whether the idea had merit. Mr. Shafton recommended that certain information relative to the potential organization of a savings and loan association in Goleta be obtained. The information was secured and based on its favorable nature an initial meeting was held on March 30, 1963. Mr. Levy, Mr. Towbes, and Mr. Shafton attended the meeting along with other interested prospective participants. At this meeting Mr. Shafton presented a general outline of the procedure for incorporating a savings and loan association. Those present concluded that they would consider the matter and hold a second meeting to determine if they wished to proceed.

A second meeting was held on April 3, 1963, at which the original parties were in attendance, as well as petitioner Harris W. Seed (since petitioner Nancy C. Seed is involved in this proceeding only by reason of a joint return, singular references to petitioner refer to Harris W.

Seed). At this meeting the 13 participants (hereinafter referred to as incorporators) agreed among themselves to take the requisite steps looking to the incorporation of a savings and loan association in Goleta. The incorporators agreed to file the appropriate "Application for Approval of Articles of Incorporation of Pueblo Savings & Loan Association" (hereinafter referred to as application) with the savings and loan commissioner of the State of California.

In order for the articles of incorporation of a savings and loan association to be filed with the secretary of state of California, such above-noted application must be approved by the savings and loan commissioner.

The incorporators further agreed to employ the law firm of Greenberg, Shafton and Bernhard to incorporate the proposed association and to pursue the application with the savings and loan commissioner. They agreed to contribute $1,000 each to an "Organization Fund" to defray the costs of making the application. They also agreed to interview Mr. C. F. Rowley of C. F. Rowley & Associates with a view to employing him to conduct an economic survey, which was required as a supporting document to the application to the savings and loan commissioner. On April 6, 1963, petitioner deposited $1,000 in the "Organization Fund."

At a third meeting on April 8, 1963, the incorporators agreed to employ C. F. Rowley & Associates to conduct the economic survey and to employ a certified public accountant to prepare the necessary financial statement for submission with the application. They further agreed to proceed as rapidly as possible to file the application, and thereafter complete incorporation and commence operations of a savings and loan association.

On April 13, 1963, a fourth meeting was held and petitioner was included in the agreed group of directors.

At a fifth meeting of the incorporators on April 18, 1963, the 13 incorporators subscribed to 44,400 shares of the proposed corporation of which petitioner subscribed to the purchase of 4,500 shares for an aggregate consideration of $63,000. It was further agreed that 13,600 shares of stock would be offered to the public after receipt of a preliminary economic report from Mr. Rowley.

Following a favorable preliminary report from Mr. Rowley on what his final economic report would contain, the incorporators went forward with the remaining steps for the filing of the application. These steps included solicitation of the public for the purchase of stock which resulted in 156 individuals orally subscribing to purchase 14,410 shares. In addition financial statements, affidavits, and biographical data on each of the proposed directors and 5-percent shareholders were completed; the name Pueblo Savings & Loan Association

(hereinafter referred to as Pueblo) was reserved with the secretary of state of California; and proposed articles of incorporation and bylaws were prepared for submission to the savings and loan commissioner. On May 13, 1963, the application was filed with the said commissioner.

On or about the time of the Pueblo application a competing application was filed with respect to the Goleta area. Thereafter, on June 25, 1963, the commissioner held hearings upon the Pueblo application. The Pueblo incorporators, including the petitioner, were called as witnesses.

On October 4, 1963, the incorporators were notified by Mr. Shafton that on October 1, 1963, the Pueblo and the competing applications were both denied on the ground that the area was adequately served by its present facilities. Mr. Shafton informed the incorporators that the denial was a result of their failure to satisfy a regulation of the savings and loan commission that an area to be served by a savings and loan association must contain 25,000 residents. He also informed them that a new regulation had been promulgated as of July 15, 1963, which would obviate the previous requirement; and that on this basis a further application should be favorably received. The new application would be, in substance, a continuation of the old.

Thereafter on October 11, 1963, the incorporators held a meeting at which they acceded to Mr. Shafton's recommendation that they refile the application. Pursuant to this decision the incorporators made additional contributions to the organizational fund. The petitioner contributed $566.82.

In furtherance of the incorporators' decision to resubmit the application, an application for organizing permit was filed with the commissioner on October 12, 1963. This was in accordance with the July 1963 regulations which required this precondition to filing an application for approval of articles of incorporation. Consequently, on December 10, 1963, an organization permit authorizing the incorporators to proceed with preparing and filing an application was issued.

Pursuant to this permit a new application was drawn and filed on January 18, 1964. The incorporators contacted again the members of the public who were interested in subscribing to shares to confirm their interest in the stock. On or about this time the competing application of another group was also filed. On March 10 and 11, 1964, public hearings were held concerning both applications and the incorporators herein involved were called upon to testify. On July 15, 1964, the commissioner denied the application of the Pueblo group and granted approval of the application of the competing group, Goleta Savings & Loan Association, which is now actively engaged in business. These factors made it impossible for the incorporators to complete the for-

mation of Pueblo Savings & Loan Association. After the second denial the incorporators, including petitioner, abandoned their agreement to form a savings and loan association.

Petitioner had expended $1,566.82 as his prorata share of the incorporators' expenses, for which he was not compensated by insurance or otherwise. The expenses incurred consisted of the cost of the economic survey, services of a certified public accountant, legal services, filing fees with the savings and loan commissioner, reimbursement for photostating and telephone expenses, and a court reporter's fee for reporting and transcribing the hearing before the savings and loan commissioner.

The parties to this controversy have stipulated that the agreement of the incorporators to take the necessary steps to incorporate a savings and loan association and their expenditures in that direction was for the purpose of thereafter realizing a profit.

On their tax return for the calendar year 1964 the petitioners treated their prorata share of the amounts expended (i.e., $1,566.82) as a loss from a transaction entered into for profit under section 165(c)(2) of the Internal Revenue Code of 1954.[1] In his statutory notice of deficiency respondent disallowed the deduction.

The sole issue for our decision is whether or not the petitioners entered into a transaction for profit under section 165(c)(2).[2] It is the respondent's contention that the petitioners did not proceed as far as necessary with their project so that it can be fairly said that they entered into a transaction for profit. It is his view that the expenses at issue merely represent the cost of an investigation of a possible business opportunity and that such investigatory expenses are not deductible.

Section 165 provides in subsection (a) that any loss not compensated for by insurance or otherwise shall be a deductible item. Subsection (c) limits this general provision with respect to losses incurred by individuals. Paragraph (1) of subsection (c) permits an individual to deduct "losses incurred in a trade or business." Paragraph (2) provides that an individual may deduct "losses incurred in any transaction entered into for profit, though not connected with a trade or business." This latter paragraph is the one directly in controversy.

As noted the parties have stipulated that the petitioner was seeking to realize a profit from his role in the savings and loan association

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise stated.

[2] Sec. 165(c)(2) reads as follows:

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

*     *     *     *     *     *     *

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

venture and that the venture was eventually abandoned after he had expended the sum of $1,566.82 in its furtherance. Hence our analysis can be limited essentially to the meaning of the word "transaction" as used in section 165(c)(2).

The legislative history of this particular provision is not very helpful on this score. In fact, the legislative history reveals that the congressional interest in the progenitor of the provision, which was contained in the Revenue Act of 1916, centered on the requirement that there be a profit-making motive to the venture. This background no doubt explains why, as we put it in *Theodore B. Jefferson*, 50 T.C. 963, 968 (1968), "This provision has been interpreted to refer to all transactions induced *primarily* by a profit motive." (Emphasis in original.) The proper motive is, as noted, an element that has been conceded in this case.

With respect to the meaning of the word "transaction," apparently the only discussion concerning its meaning is contained in comments made during the debate in the U.S. Senate to the effect that the word was "a very broad word" and that the word "by itself means anything." 53 Cong. Rec. 13265 (1916).

It is obvious, however, that Congress intended to grant a deduction for a loss which arose out of activities which constituted something less than the carrying on of a trade or business. To hold otherwise would be to render section 165(c)(2) a nullity since losses incurred in a trade or business are deductible under section 165(c)(1). We will not assume that Congress did a useless thing, *Mercantile National Bank* v. *Langdeau*, 371 U.S. 555 (1963). Accordingly it was appropriate to note in *Eli D. Goodstein*, 30 T.C. 1178, 1192 (1958), affd. 267 F.2d 127 (C.A. 1, 1959), that "It is clear that the type of transaction to which the statute refers is one which has *substance* and in which there is a true motive of deriving a profit." (Emphasis supplied.) On the other hand we must conclude that the phrase "a transaction entered into for profit" surely means something more than the mere casual preliminary investigation of a prospective business or investment.

With respect to the facts at hand it is our opinion that the extensive activities of the petitioner as a participant in a joint venture to secure a charter for a savings and loan association, of which he would be a shareholder should the venture prove successful, qualify as a "transaction" within the purview of section 165(c)(2). These activities of petitioner and his fellow incorporators may be summarized as follows:

(1) Employed a law firm to incorporate the savings and loan association and to pursue the appropriate application to the savings and loan commissioner;

(2) Agreed among themselves to pay, and subsequently did pay, the expenses incurred in organizing the savings and loan association;

(3) Agreed to employ, and subsequently did employ, a firm to con-

duct the necessary economic survey which was required as a supporting document to the application;

(4) Employed a certified public accountant to prepare the financial data required to be submitted with the application;

(5) Agreed that of the 13 original incorporators 8, including the petitioner, would serve as the original board of directors;

(6) Agreed that the 13 incorporators would subscribe to 44,400 shares of stock of the proposed corporation with petitioner agreeing to purchase 4,500 shares of said amount for a total consideration of $63,000;

(7) Solicited the general public to purchase additional shares, originally in the aggregate amount of 13,600, with the result that 156 individuals actually subscribed orally to purchase a total of 14,410 shares;

(8) Submitted one application for approval of articles of incorporation which was denied, and then a second application after the governing regulations were amended;

(9) Appeared as witnesses, petitioner included, at public hearings with respect to both applications.

The above activities stretched throughout the period commencing April 3, 1963, and running through July 15, 1964, when the second application was denied and approval given to a competing application.

Until the second application was denied and petitioner and his cohorts abandoned their efforts to secure a savings and loan charter, petitioner was committed to the purchase of stock in the association should the charter be issued. He was legally liable to purchase said property and would have been subject to suit by his fellow incorporators had he failed to live up to his subscription agreement.[3] Thus, the only additional step he could have taken would have been to have actually purchased the stock. His failure to purchase the stock was attributable to causes beyond his control; namely, the refusal of the savings and loan commissioner to issue a charter.

Our holding finds support in *Charles T. Parker*, 1 T.C. 709 (1943). There an individual who had been engaged in the mining business was approached about the possibility of investing in a certain mining operation which was suffering from a shortage of funds. In stating

---

[3] With respect to the effect of an irrevocable commitment see discussion in *Rumsey* v. *Commissioner*, 82 F. 2d 158 (C.A. 2, 1936), concerning the effect of a commitment of a house to the rental market on the tax treatment of a loss on a subsequent sale thereof.

why the individual should be allowed to deduct as a loss his expenses incurred in investigating the possibility we said:

He asked a competent person to investigate the placer property. This was done without charge. The report was favorable. In fact, Anderson advised petitioner and others to advance money; he also advanced money; and placer mining operations were carried on. Petitioner and the others entered into a joint venture. The venture was a business undertaking and the object was to make profits. The parties expected that the runs would yield a sufficiently high rate of recovery of gold to warrant further investment and continued operations. If the results had been more favorable, the operations would have been continued. The carrying on of operations for thirty days constituted more than a mere preliminary investigation. The operations, in fact, were usual operations and they were carried on after Anderson had made the preliminary investigation. All that was done involve the elements of entering into a transaction for profit within the meaning of the statute. *The operations were preliminary to making arrangements for permanent operations, it is true. But they were actual operations and the fact that they did not result in a permanent undertaking does not take the transaction outside the statutory provision.* * * * [Emphasis supplied; 1 T.C. at 711.]

Our decision here finds further support in *Finch* v. *United States*, an unreported case (D. Minn. 1966, 18 A.F.T.R. 2d 5259, 66–2 U.S.T.C. par. 9542). There a taxpayer sought to have his claimed deduction of expenses incurred in an unsuccessful attempt to secure a site for a Holiday Inn Motel and a franchise to operate the same sustained. The taxpayer prevailed.

Respondent relies heavily on our decision in *Morton Frank*, 20 T.C. 511 (1953). The petitioner therein sought to deduct as a loss under the 1939 Code predecessor to section 165(c)(2) expenses incurred in the visitation to many cities in search of a newspaper to buy. He eventually did purchase a paper in Canton, Ohio. We disallowed the expenses incurred in his visits to other cities with the comment that the taxpayer had not entered into any transaction but rather had refused to enter them after preliminary investigation.

The *Frank* case is distinguishable from the facts before us in that at no time was Frank committed to buy a paper in the cities he visited on his investigation trips. As noted Seed was committed to purchase stock should articles of incorporation be issued. Furthermore, we note the qualifying language in *Morton Frank, supra* at 514, wherein it was said "If the general search for a suitable business property itself be considered as a transaction entered into for profit" then the project was not abandoned. In our case the fact of abandonment has been stipulated.

In view of the foregoing,

*Decision will be entered under Rule 50.*