Roy L. Harding and Myrtle V. Harding v. Commissioner.
Harding v. Commissioner
Docket Nos. 261-68, 262-68.
United States Tax Court
T.C. Memo 1970-179; 1970 Tax Ct. Memo LEXIS 178; 29 T.C.M. (CCH) 789; T.C.M. (RIA) 70179; June 29, 1970, Filed. Claude R. Wilson, Jr., 2330 Republic National Bank Tower, Dallas,Tex., for the petitioners. Thomas E. Fontecchio, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in income taxes due from the petitioners as follows: Petitioner
Calendar Year
Deficiency
Roy L. Harding [1]
1966
$2,148.41
Myrtle V. Harding
1966
$2,236.49
By order of the Court the cases were consolidated for hearing, briefing and opinion. The deficiencies resulted from the disallowance by the respondent of certain deductions claimed by petitioners in their separate returns consisting of the following: Docket No.
Docket No.
Disallowance
261-68
262-68
Total
Expenses incurred by Roy L. Harding on behalf of Harding Brothers Oil and Gas Co.
$ 765.67
$ 765.67
$ 1,531.34
Costs incurred under Great Plains Conservation Program
1,214.31
1,214.31
1,214.30
2,428.61
Net operating loss of Shangri-La International, Inc.
5,363.29
5,363.29
10,726.58
*180 An adjustment was also proposed by the respondent with respect to the allowance of the medical deduction which is dependent upon the determination of other issues. All other issues involved in the examination of the petitioners' returns have been agreed to by the parties. The questions presented for decision are: (1) Whether the petitioner is entitled to deduct as ordinary and necessary expenses within the meaning of section 162 [2] expenditures incurred by the petitioner on behalf of Harding Bros. Oil and Gas Co. (2) Whether the amounts paid to the petitioner by the Department of Agriculture on account of capital expenditures incurred under contract as part of the Great Plains Conservation Program are excludable from income. If not, whether the loss on account of the partial failure of the seeding pursuant to such contract exceeded the amount allowed by the respondent. 790 (3) Whether the pre-incorporation expenditures in connection with the proposed acquisition and development of property in Puerto Vallarta, Mexico, resulted in a net operating loss incurred *181 by Shangri-La International, Inc. During the taxable period ending December 31, 1966. Findings of Fact The parties submitted stipulation of facts, supplemented by oral testimony. The facts as stipulated are incorporated herein. Roy L. Harding and Myrtle V. Harding are husband and wife who filed separate returns for the year 1966 with the district director of internal revenue, Dallas, Texas. On January 11, 1968, the date of the filing of the petitions upon which this proceeding is based, petitioners resided in Dallas, Texas. The individual income tax returns for Roy L. Harding and Myrtle V. Harding contain identical figures down to the tax computation, Item 11-b. At this point in the tax computation the figure on 11-c is divided thus "(1/2 to W)," therefore the dollar amount of each issue represents the aggregate adjustment, one half being applicable to each petitioner. During the taxable year of 1966 the petitioner was employed as president of Harding Bros. Oil and Gas Co. (hereinafter referred to as the oil company). In that year petitioner personally paid business expenses of the oil company for promotion, dues and subscriptions, and travel in the respective amounts of *182 $290.49, $444.13, and $796.92, totaling $1,531.54. Prior to the year 1966 the petitioner and his brother, Charles F. Harding, had incurred similar expenses on behalf of the oil company and had been reimbursed for such expenses. While their recollection varied, it may be that at other times petitioner and his brother had been reimbursed for expenses incurred on behalf of the oil company. At some time during the taxable year 1966, petitioner and his brother agreed that, due to the fact that the oil company was having a "poor year," they would bear such expenses without reimbursement. In the return filed by the oil company for the year 1966, the petitioner was shown as the owner of 24.24 percent of its stock and Charles F. Harding, his brother, as the owner of 24.73 percent of its stock, making up a total of 48.97 percent. With respect to the expenditures in question, the agreement between petitioner and Charles F. Harding whereby certain expenses incurred on behalf of the oil company would be borne by them individually was not reflected in any formalized minutes or agreement requiring that any of the officers be required to pay corporate expenses out of personal funds. The petitioner *183 at no time made either a formal or informal demand on the oil company for reimbursement on account of expenses paid by him. In its return for the taxable year 1966 the oil company showed a loss for tax purposes of $245,168.22. In arriving at that loss, the oil company deducted intangible drilling expenses of $149,472.50. Its books reflected a net loss of $114,544.47. As of December 31, 1966, the oil company had cash on hand of $191,093.13. During the taxable year 1966 petitioner owned a 300-acre farm in Brown County, Texas. On or about April 13, 1966, petitioner entered into a contract with the Secretary of Agriculture pursuant to the Great Plains Conservation Program covering the period from March 15, 1966 to December 31, 1969. Pursuant to said agreement, petitioner became obligated to incur certain expenditures for clearing and preparing the land, planting grass seed, and the construction of two ponds, on account of which the Department of Agriculture agreed to reimburse petitioner for a share of the costs up to a total of $5,135.28. During the taxable year 1966 the petitioner expended $4,923.04 in clearing and preparing the land and planting grass seed. During that year the *184 petitioner also expended $447.30 for a pond. The petitioner received $3,886.25 from the Department of Agriculture as its share of the cost of these improvements. The petitioner did not attempt to show that the land was productive prior to being cleared and seeded. After the land was cleared and seeded, it was used to graze cattle. In petitioners' return of income from farming for the taxable year 1966, petitioners claimed a loss of $3,191.29 which was arrived at as follows: Income:
Agricultural Programs Expended
$4,923.04
Expense:
Interest
$443.10
Taxes
200.22
Insurance
38.54
Agricultural Programs Expended
$4,923.04
Depreciation 1,472.64
$7,077.54
Loss Per return
($3,191.29) 791 In the notice of deficiency the respondent disallowed as a deduction the sum of $2,428.61 of the deduction of $4,923.04 as having been spent for capital improvements. The respondent allowed as a deduction the sum of $2,494.43 as representing the cost of seeding that was unsuccessful. By the end of the growing season of the year 1966 it could not be determined whether the seeding of petitioners' farm pursuant to the contract with the Department of Agriculture *185 would fail to produce a stand of grass. By the end of the growing season of the year 1969 it was apparent that the seeding was partially successful with the exception of approximately 85 acres which would require reseeding. At least as early as March of 1966 petitioner was negotiating with Senor Pedro A. Chapa of Mexico regarding the purchase or acquisition of certain land at Puerto Vallarta, Mexico, owned or under the control of Senor Chapa, including the possibility of financing, building and operating a resort area on the land. In connection therewith petitioner acquired plans and sketches prepared as a result of the interest of a prior group of investors looking into the property. As a result of his interest in the possible acquisition and development of the property at Puerto Vallarta, Mexico, petitioner made several trips to Mexico City. He engaged the law firm of Goodrich, Dalton, Little and Riquelme of Mexico City to advise him with respect to restrictions on the ownership of such land by other than Mexican citizens. He engaged the firm of M.P.F. Research of Dallas, Texas, market research consultants, to advise him with respect to the type of development and uses which *186 would result in the realization of the maximum economic benefits from the development of such property. Petitioner also incurred other expenses such as advertising and the printing of letterheads bearing the name of Shangri-La International, Inc., a corporation which the petitioner proposed to organize for the purpose of carrying forward the acquisition and development of such property. On or about September 13, 1966 petitioner caused to be organized Shangri-La International, Inc., a Texas corporation. Petitioner duly filed an election on behalf of Shangri-La to be taxed as a small business corporation under subchapter S. Thereupon, the petitioner cause to be transferred to Shangri-La the expenditures incurred by the petitioner in connection with the negotiations and exploration of the possible acquisition and development of the property amounting to $10,726.58 consisting of the following: Advertising
$ 196.62
Art Work
600.00
Bank Charges
3.00
Legal and Accounting
3,952.67
Office Expense
1,130.50
Research
1,500.00
Travel Expense
3,356.39
Depreciation 10.01
$10,749.19
Less: Discounts Earned 22.61 $10,726.58
In its return for the taxable *187 period from September 13, 1966 to December 31, 1966 Shangri-La claimed a net operating loss of $10,726.58 consisting of the expenditures incurred by the petitioner as set forth above. Neither the petitioner nor Shangri-La was legally obligated during the taxable year 1966 to acquire the property at Puerto Vallarta, Mexico. Other than a verbal understanding reached at some time during the course of the negotiations between the petitioner and Senor Chapa, neither the petitioner nor Shangri-La had at any time any agreement, commitment or option which legally obligated the owners of said property to sell the same to the petitioner or to Shangri-La. Ultimate Findings of Fact Petitioner was not required in his capacity as president of Harding Bros. Oil and Gas Co. personally to bear any of the expenses of the oil company. Ordinary and necessary expenses of the oil company borne by the petitioner during the taxable year 1966 were not the ordinary and necessary expenses of the petitioner in his capacity as president. The loss sustained by the petitioner on account of a partial failure of the seeding of his farm pursuant to the contract with the Secretary of Agriculture did not exceed *188 $2,494.43. The pre-incorporation exploratory expenditures incurred by the petitioner and contributed to the capital of Shangri-La did not become worthless due to the abandonment 792 of the Puerto Vallarta project on or before December 31, 1966. Opinion Issue 1. Expenses Incurred on Behalf of Employer During the taxable year 1966 petitioner was president of Harding Bros. Oil and Gas Co. Charles F. Harding, his brother, was secretary-treasurer. While petitioner testified that together they owned all of its outstanding stock, the return filed by the company listed the petitioner as owner of 24.24 percent of its stock and his brother as owner of 24.73 percent of its stock, making up a total of only 48.97 percent of its stock. There is nothing in the record to show ownership with respect to the balance. Prior to the taxable year 1966 the petitioner and his brother had incurred expenses on behalf of the company. Usually, they were reimbursed by the company for such expenses and presumably the amount thereof was reflected as ordinary and necessary business expenses in the returns of the company. At other times, the petitioner or his brother might not be reimbursed for such *189 expenses. At some time during the taxable year 1966, the petitioner and his brother agreed that due to the fact that the company was having a "poor year" they would bear such expenses without reimbursement. Pursuant to that agreement petitioner incurred expenses of $1,531.34 on behalf of the company for which he was not reimbursed. Petitioner and his wife each deducted one half of that amount in their respective returns. The respondent readily concedes that the amounts in question are proper business expenses if attributable to the petitioner. However, the respondent has determined that the expenses were not deductible as ordinary and necessary expenses of petitioner in his employment as president of the corporation. The petitioner recognizes that a corporate officer who pays the expenses of his employer is not entitled to a deduction even though he is not reimbursed by his employer. See Andrew Jergens, 17 T.C. 806 (1951). However, the petitioner points out that the respondent has recognized that reimbursement of, or a corporate resolution requiring the assumption of, travel *190 and entertainment expenses tends to indicate that such expenses are necessary expenses of a taxpayer's employment as a corporate officer. Rev. Rul. 57-502, 1957-2 C.B. 118. The petitioner argues that: "* * * the agreement between the two stockholders that they should pay their own expenses rather than submit expense accounts to the corporation for reimbursement is tantamount to the corporation requiring the two brothers to bear these expenses." From this premise the petitioner concludes that as he was required to incur these expenses in connection with his employment as president of Harding Bros. Oil and Gas Co. he is entitled to deduct such payments as necessary expenses of that office. The Court cannot accept the premise on which petitioner rests his argument. There is nothing in the record to justify the conclusion that the "understanding" or "agreement" between petitioner and his brother was "tantamount" to a requirement by their employer that they bear the expenses in question. Whether this was the "only year" in which this practice had been followed, as testified to by petitioner's brother, or whether similar expenses had been incurred in prior years for which *191 there had been no reimbursement, as testified to by the petitioner, is immaterial. The informal agreement on the part of the petitioner and his brother not to claim reimbursement of such expenses for the taxable year 1966 was merely a "temporary" arrangement to shift the expense from the company to the petitioner and his brother upon the realization that the company would not have any income for the taxable year 1966. The testimony of the petitioner that he and his brother owned substantially all of the stock of the company only serves to confirm this fact. If the petitioner and his brother had been minority stockholders, it might have been to the petitioner's detriment to bear an expense individually which should properly have been charged to the company. Since, however, the petitioner regards himself and his brother as owning all of the stock, his failure to claim reimbursement for an expenditure on behalf of the corporation had no practical effect other than to reduce petitioner's tax liability to the extent allowable as a deduction in his individual return. The petitioner by his own action in failing to seek reimbursement from the corporation cannot convert a business expense *192 of 793 the corporation into his own expense. Horace E. Podems 24 T.C. 21 (1955). Issue 2. Agricultural Program Expenditures On or about March 15, 1966 petitioner contracted with the Secretary of Agriculture to clear the brush, construct two ponds and plant grass seed on a 300-acre farm as part of the Great Plains Conservation Program. The program was initiated pursuant to section 16(b) of the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. 590p, which provided, in part, as follows: (b) Notwithstanding any other provision of law - (1) the Secretary is authorized, within the amounts of such appropriations as may be provided therefor, to enter into contracts of not to exceed ten years with producers in the Great Plains area determined by him to have control for the contract period of the farms or ranches covered thereby. * * * Under the contract the producer shall agree - (i) to effectuate the plan for his farm or ranch substantially in accordance with the schedule outlined therein unless any requirement thereof is waived or modified *193 by the Secretary pursuant to paragraph (3) of this subsection; (ii) to forfeit all rights to further payments or grants under the contract and refund to the United States all payments or grants received thereunder upon his violation of the contract at any stage during the time he has control of the farm if the Secretary determines that such violation is of such a nature as to warrant termination of the contract, or to make refunds or accept such payment adjustments as the Secretary may deem appropriate if he determines that the producer's violation does not warrant termination of the contract; (iii) upon transfer of his right and interest in the farm or ranch during the contract period to forfeit all rights to further payments or grants under the contract and refund to the United States all payments or grants received thereunder unless the transferee of the farm or ranch agrees with the Secretary to assume all obligations of the contract; (iv) not to adopt any practice specified by the Secretary in the contract as a practice which would tend to defeat the purposes of the contract; *194 (v) to such additional provisions as the Secretary determines are desirable and includes in the contract to effectuate the purposes of the program or to facilitate the practical administration of the program. In return for such agreement by the producer the Secretary shall agree to share the cost of carrying out those conservation practices set forth in the contract for which he determines that costsharing is appropriate and in the public interest. The portion of such cost (including labor) to be shared shall be that part which the Secretary determines is necessary and appropriate to effectuate the physical installation of the conservation measures under the contract; Pursuant to the contract, the Secretary of Agriculture was to reimburse the petitioner for a stated percentage of the cost to be incurred in making specified improvements to the land. During the taxable year 1966, the petitioner incurred cost for certain of such improvements amounting to $4,923.04 on account of which petitioner received payments from the Department of Agriculture amounting to $3,886.25. The petitioners reported the payments received under the contract in the amount of $3,886.25 as gross income deducting *195 therefrom expenditures of $4,923.04. The respondent has allowed a deduction of $2,494.43 of the amount claimed as representing the seeding of acreage which was not successful. The respondent has disallowed the balance upon a determination that the sum of $2,428.61 was spent for capital improvements. In the Schedule of Farm Income and Expense attached to petitioner's return, the amount deducted was treated as an ordinary and necessary expense of farming. At the trial the petitioner claimed that the amount was deductible since the seeding proved to be wholly unsuccessful. In the alternative, petitioner also argued that the amounts received under the contract as reimbursement for expenditures made by the petitioner should be excluded from income. With respect to the inclusion of the payments under the Great Plains Conservation Program in gross income of the petitioners, respondent cited Rev. Rul. 60-32, 1960-1 C.B. 23. The rationale of that ruling is stated as follows: Acreage reserve and the cost-sharing and annual conservation reserve payments, whether in cash or, at the *196 option of the producer, in grain, are in the nature of receipts from farm operations in that they replace income which producers could have expected to realize from the normal use of the land devoted to the program. As such, they are includible in gross income. See I.T. 2767, C.B. XIII-1, 35 (1934); I.T. 2992, C.B. XV-2, 75 (1936); I.T. 3379, C.B. 1940-1, 16; and Baboquivari Cattle Co. v. 794 Commissioner, 135 Fed. (2d) 114, Ct. D. 1588, C.B. 1943, 1013. The payments received by the petitioner are distinguishable both with respect to the type of payment dealt with in the ruling and the citations set forth therein. Amounts paid under the Great Plains Conservation Program were not "in the nature of receipts from farm operations" and did not "replace income which producers could have expected to realize * * *." Congress specifically ruled out any payments of that type. [3]
*197 On the contrary, the payments in question amounted to a "subsidy" of a part of the cost of an expenditure which was capital in nature. There is no indication that the land was productive prior to being cleared and seeded. After the land was cleared and seeded, it was used to graze cattle. Thus, it must be assumed that the clearing and seeding made the land suitable for a new use. The cost of preparing the land for such use was a capital expenditure. See H. L. McBride, 23 T.C. 901 (1955); Thompson and Folger Co., 17 T.C. 722 (1951). Such expenditures fall within the definition of soil and water conservation expenditures under section 175(c)(1). [4] See section 1.175-2(b)(2), Income Tax Regs. Subject to the limitations set forth therein, section 175 provides that the taxpayer may elect to treat such expenditures - otherwise chargeable to a capital account - as expenses. However, in the absence of an election on the part of the taxpayer, [5] the expenditures clearly fall within the scope of capital expenditures. Thus, no part of the $4,923.04 expended on agricultural programs was deductible as an ordinary and necessary expense of *198 farming. The respondent allowed as a deduction the sum of $2,494.43 as representing the cost of seeding that was unsuccessful. The petitioner has failed to show that he is entitled to a larger deduction. *199 The petitioner included the amounts received under the Great Plains Conservation Program in his gross income. However, he argues on brief that those payments were not income. It is the petitioner's position that he and the Federal government entered into something in the nature of a partnership and that the payments made by the Department of Agriculture for clearing and seeding his land were partnership contributions. The Soil Conservation and Domestic Allotment Act provides for subsidy payments and not partnership contributions, and the only question presented on the facts of this case is whether such subsidy payments can be excluded from income. While it might seem inconsistent for the government to offer to share the cost of an expenditure to be incurred by the taxpayer in the making of farm improvements, while at the same time taxing his contribution towards such costs as gross income, the law in this respect is well settled. Where the Congress intends that such payments be excluded from gross 795 income, either the enabling legislation or the Internal Revenue Code specifically provides for the exclusion. Thus, for example, section 621[6] specifically excludes payments received *200 on account of capital expenditures for the exploration, development or mining of critical and strategic minerals or metals. Since there is no similar provision excluding payments under the Great Plains Conservation Program, such payments would fall within the broad definition of gross income in section 61. *201 Issue 3. Deductibility of Loss by Subchapter S Corporation In March 1966 petitioner became interested in the possible acquisition and development of a tract of land at Puerto Vallarta, Mexico. He made several trips to Mexico in order to negotiate for the acquisition of the property. In addition, he incurred expenditures for legal services, market analysis for the utilization of the tract, architectural design, advertising and similar costs. Such expenditures were incurred prior to September 13, 1966. In September 1966 petitioner organized a corporation under the laws of Texas known as Shangri-La International, Inc. On September 13, 1966 that corporation elected to be taxed as a small business corporation under subchapter S of the Internal Revenue Code. At about the same time, that corporation picked up on its books the prior expenditures which had been incurred by the petitioner. In its return for the taxable period from September 13, 1966 to December 31, 1966 Shangri-La showed a net operating loss of $10,726.58, consisting of the expenditures which had been incurred or to which it had been committed by petitioner prior to its organization. The corporation has continued to *202 file tax returns for subsequent years but has not been engaged in any business. In their individual returns, the petitioners each deducted one-half of the net operating loss of $10,726.58 shown in the corporate return. In the notice of deficiency the respondent disallowed that deduction with the following explanation: It is determined that the allowable business expense of this small business corporation equals the income and that the excess of $10,726.58 is not allowable under the provisions of the internal revenue laws. In his opening statement, counsel for the respondent stated his position with respect to this issue, as follows: * * * The fifth issue pertaining to the subchapter - so called subchapter "S" corporation and whether or not these expenses were incurred as ordinary and necessary business expenses for that corporation or, as respondent's position is, that those were not ordinary and necessary business expenses, but were expenses incurred for investigatory purposes in order to seek out a comtemplated [sic] business. * * * At the conclusion of the cross examination of petitioner, an effort by the Court to define the position of the parties resulted in the following *203 colloquy: The Court: Well, then, as to this transaction, doesn't the respondent recognize that the corporation concurred [sic] a loss? There may be some difference in how we characterize a loss. Mr. Fontecchio: The Shangri-La itself incurred a loss - no, we can't say - The Court: Well, then what did you have? How are you going to treat these expenses, are you going to capitalize them? Mr. Fontecchio: Capitalize them, yes, sir. The Court: And write them off against what? They are not good will. Mr. Fontecchio: According to the law as I understand it, these were investigatorial expenses incurred in forming the corporation. 796 The Court: I don't think you can say they were incurred in forming the corporation. They had nothing to do with the organization of the corporation. * * * Mr. Fontecchio: Well, it had much to do with whether this corporation would go into business in Mexico. The Court: Well, you were telling me a minute ago that they were still in business, but you say was going into business in Mexico, that's right. They looked into the proposition and it turned out to be not as good as it looked at first blush, so the expenditures became worthless. *204 Mr. Fontecchio: True. The Court: All right. Now, how do we treat them. Mr. Fontecchio: At that time, the corporation was not even in existence. Therefore, it was Mr. Harding's money, the expenses were paid by Mr. Harding, he was contributing this to a corporation that might be formed in the future. The Court: Well, if the corporation wasn't in existence, and the expenses turned out to be worthless, why shouldn't Mr. Harding be allowed to deduct them, then? Mr. Fontecchio: Because they are expenses that were incurred for looking around for a new business, and not for operating a business, and there is, in my humble opinion, a distinct difference. The Court: And that's the issue - I mean, I'm trying to find out just what the issue is here. Is it the issue that the corporation wasn't in existence yet, because you treated these as expenses of the corporation. You didn't treat these as Mr. Harding's expenditures in your 90 day letter. Mr. Fontecchio: The taxpayer treated them that way. * * * The Court: Now, how do you want to treat them, as Mr. Harding's expenses or as the corporation's expenses? Mr. Fontecchio: We are treating them as exploratory expenses - The Court: *205 Of the corporation? Mr. Fontecchio: Of the corporation. The Court: All right, very good, so they are the exploratory expenses of the subchapter S corporation which proved to be worthless. Mr. Fontecchio: Right. Subsequently, counsel for the respondent sought to present the testimony of the examining revenue agent with respect to statements made by Mr. Roy L. Harding to the effect that Mr. Harding still had the project in mind and thought it was a good business proposition. The Court excluded such testimony as being in conflict with prior statements of counsel offering such testimony. On the record the only issue presented for decision is, therefore, whether during its taxable period ending December 31, 1966 Shangri-La sustained a loss in the amount of $10,726.58 on account of the abandonment or worthlessness of the proposed acquisition and development of the property at Puerto Vallarta, Mexico, which loss resulted in a net operating loss within the meaning of section 1374 allowable as a deduction from gross income of the shareholders of such corporation. The petitioner became interested in the possible acquisition and development of certain property at Puerto Vallarta, *206 Mexico. As indicative of that interest, he made several trips to Mexico to confer with the owners of the property, sought legal, architectural and marketing counsel, and incurred other expenditures amounting to $10,726.58. The parties further agree that such expenditures were contributed to the capital of Shangri-La as pre-incorporation exploratory expenditures which subsequently became worthless. At the time of the trial more than three years had elapsed. Shangri-La had not transacted any business and had no option or contract with respect to the property. While respondent sought to show that petitioner still expressed an interest in the development of this property at the time of the examination of his return for the year 1966, if anything should come of that interest, it would be a new venture and not the continuation of a project which had been aborted more than three years before. Accordingly, for purposes of decision, we may assume that Shangri-La sustained a loss on account of the abandonment of the project to acquire the property at Puerto Vallarta. As the parties seemingly agreed at the trial, the expenditures in question were not deductible by the petitioners as ordinary *207 and necessary expenses incurred by them in the carrying on of a trade or business within the meaning of section 162. Instead, the parties elected to treat these expenditures as pre-incorporation expenses incurred for the benefit of Shangri-La. As such, the 797 expenditures were chargeable to the capital account of the corporation. Dwight A. Ward 20 T.C. 332 (1953), affd. on other issues 224 F. 2d 547 (C.A. 9, 1955). It is also clear that as of September 13, 1966 the proposal for the acquisition and development of the Puerto Vallarta property was still in the formative stage. Cf. Frank B. Polachek 22 T.C. 858 (1954). In fact, it is doubtful if the proposal ever developed beyond that stage. While petitioner may have believed that he had a commitment or option from the owners of the property, it certainly does not appear that the negotiations ever reached the stage where the owners were legally obligated to sell. As the Court also pointed out in the Polachek case, there is nevertheless the question whether such expenditures are deductible as a "loss" by Shangri-La in the year that the project was abandoned. See also Harris W. Seed 52 T.C. 880 (1969). *208 Since the expenditures in question were incurred on behalf of the corporation, the amount in question should be added to the petitioners' basis of the stock. Dwight A. Ward, supra.As a corollary, the amount thus added to the basis of the stock becomes an "asset" on the books of Shangri-La. When the proposal to acquire and develop the Puerto Vallarta property was abandoned, that asset became worthless. In the case of the corporate taxpayer, such abandonment usually results in an ordinary loss in arriving at its taxable income. Rev. Rul. 57-503, 1957-2 C.B. 139. Nevertheless, it is also incumbent on the petitioners to establish the year of loss, that is, to show when the abandonment, in fact, occurred. There is no identifiable event which fixes the time when it was decided not to pursue the matter any further. With respect to this, petitioner was very vague. He testified. * * * On June 25, Mr. Judd Austin, whom we had contacted through Mr. Wilson's firm, and the lawyer in Mexico City visited us here, and it was at this visit he felt that we should be cautious - no, no, it was at this point that he felt that he could work the deal out, and come to a conclusion *209 that would be favorable, based on some decisions that had been made along the coast down at Acapulco. In December, and again I have to be vague on dates, but I feel like I can get this date from Mr. Austin, and he was in Dallas, and he felt that the size of the project we were anticipating there was too dangerous for us to follow through with. The Wall Street Journal ads were run on August 10, 11, and the 12th in the East Coast edition and the West Coast edition, and the Southwest edition. Those are the dates that I can furnish the Court. On this state of the record, which is very similar to that which formed a basis for our decision in the Polachek case, the Court is unable to find that a decision not to proceed with the Puerto Vallarta project was finalized during the taxable period ending December 31, 1966. For that reason, it cannot be said that Shangri-La sustained a net operating loss allocable to the petitioners under section 1374 in the taxable year 1966. Decisions will be entered for the respondent. Footnotes
1. Hereafter Roy L. Harding will be referred to as petitioner.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. In recommending an extension of the program in 1969, the report of the Committee on Agriculture of the House of Representatives in a review of the background of the legislation, stated: The Great Plains conservation program is not a land retirement program. No rental payments are included. It is aimed at obtaining shifts and improvement in land uses based on the varying capability of land, rather than crop reduction. This permits the units under contract to continue operation as viable farms and ranches contributing to the economic stability of rural communities. The program provides opportunities for the participants to stabilize their operations by insuring carry-over feed for livestock to avoid untimely sales during drought or other emergencies. Through application of needed conservation treatment, more dependable production and more stable income is assured.↩
4. Sec. 175(c)(1) provides, in part: (c) Definitions. - For purposes of subsection (a) - (1) The term "expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming" means expenditures paid or incurred for the treatment or moving of earth, including (but not limited to) leveling, grading and terracing, contour furrowing, the construction, control, and protection of diversion channels, drainage ditches, earthen dams, watercourses, outlets, and ponds, the eradication of brush, and the planting of windbreaks. Such term does not include - (A) the purchase, construction, installation, or improvement of structures, appliances, or facilities which are of a character which is subject to the allowance for depreciation provided in section 167, or (B) any amount paid or incurred which is allowable as a deduction without regard to this section. ↩
5. The petitioner does not contend that by deducting these expenditures he constructively elected pursuant to sec. 175↩ to treat those amounts, to the extent of the 25 percent gross income limitation, as expenses not chargeable to capital. In fact, the petitioner argues that the expenditures, with one exception, do not fall within the definition of soil and water conservation expenditures.
6. SEC. 621. PAYMENTS TO ENCOURAGE EXPLORATION DEVELOPMENT, AND MINING FOR DEFENSE PURPOSES. There shall not be included in gross income any amount paid to a taxpayer by the United States (or any agency or instrumentality thereof), whether by grant or loan, and whether or not repayable, for the encouragement of exploration, development, or mining of critical and strategic minerals or metals pursuant to or in connection with any undertaking approved by the United States (or any of its agencies or instrumentalities) and for which an accounting is made or required to be made to an appropriate governmental agency, or any forgiveness or discharge of any part of such amount. Any expenditures (other than expenditures made after the repayment of such grant or loan) attributable to such grant or loan shall not be deductible by the taxpayer as an expense nor increase the basis of the taxpayer's property either for determining gain or loss on sale, exchange, or other disposition or for computing depletion or depreciation, but on the repayment of any portion of any such grant or loan which has been expended in accordance with the terms thereof such deductions and such increase in basis shall to the extent of such repayment be allowed as if made at the time of such repayment.↩