JOHAN DOMENIE and ANNE M. DOMENIE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Domenie v. Commissioner
Docket No. 5652-73.
United States Tax Court
T.C. Memo 1975-94; 1975 Tax Ct. Memo LEXIS 278; 34 T.C.M. (CCH) 469; T.C.M. (RIA) 750094; April 7, 1975, Filed Johan Domenie, pro se. Gerald O'Toole, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND *279 OPINION QUEALY, Judge: The respondent determined a deficiency and penalty in the joint Federal income tax return of the petitioners for the taxable year 1971 in the amount of $2,015.87. Due to concessions by the parties, the issues for our decision are: (1) Whether expenses incurred in connection with a proposed acquisition of a business are deductible under section 162(a)(2), section 212(1), or section 165(c)(2)[1] and (2) Whether the expenses incurred by petitioners in advertising for a business and for a trip to Florida were part of the expenses incurred in connection with a proposed acquisition of a business or purely personal expenses. FINDINGS OF FACT Some of the facts have been stipulated. Such facts and the exhibits attached thereto are incorporated herein by this reference. The petitioners were husband and wife at the date the petition herein was filed. They filed a joint Federal income tax return for the taxable year 1971 with the district director of internal revenue, Newark, New Jersey. At the time of the filing of the petition herein, petitioner Anne *280 M. Domenie's place of residence was Scarsdale, New York, and petitioner Johan Domenie's place of residence was Hackensack, New Jersey. The petitioners are now divorced. During the year 1970, Johan Domenie (hereinafter sometimes referred to as "petitioner") was employed as manager of Banco da Lavoura de Minas Gerais, S.A., a foreign bank doing business in New York City. Having accumulated some capital to invest, the petitioner resigned that position in the fall of 1970 in order to devote full time to the search for a business which he might acquire. In response to advertisements that he placed in the Wall Street Journal and the Business Journal, in January 1971 the petitioner was contacted by Bennett Applebaum, a Florida broker. After several letters, Applebaum introduced the petitioner to Michael Enelow (hereinafter sometimes referred to as "Enelow"). Enelow was interested in selling his interest in Commercial Distributors, Inc., a retail and wholesale distributor of ice machines and fountain equipment in Irwin, Pennsylvania, which is near Pittsburgh, Pennsylvania. On January 31, 1971, petitioner flew to Pittsburgh to meet with Enelow and to make a preliminary investigation of *281 the company. Finding it met his basic requirements, on his return to New York he requested the Chase Manhattan Bank to provide him with credit information concerning Commercial Distributors, Inc. He also obtained reports from Dun & Bradstreet on the history and status of the company. Subsequently, the petitioner studied the company and its business thoroughly. He visited various establishments to acquaint himself with the products being sold by Commercial Distributors, Inc. He contracted with the accounting firm of Peat, Marwick, Mitchell & Co. to review briefly the accounting system of Commercial Distributors, Inc. Said review indicated that the rate of return on invested capital of $200,000 would be 15 percent. By February 11, 1971, the petitioner had made his own detailed analysis of the financial statements of Commercial Distributors, Inc., provided him by Enelow. He made other trips to Irwin to become familiar with the operation of the business, its staff and customers. At the petitioner's request, the Chase Manhattan Bank provided him with a letter of introduction to the Western Pennsylvania National Bank in order to obtain necessary future financing for the business. During *282 this period, the petitioner also investigated the housing and schooling conditions in the Pittsburgh area in preparation for the eventual move of his family there. After an oral agreement was entered into by the parties, on March 1, 1971, at the petitioner's request, Peat, Marwick, Mitchell & Co. made a complete audit of Commercial Distributors, Inc. The petitioner also contracted with a Pittsburgh law firm to represent him in the acquisition. He prepared a memorandum to the firm outlining the details and he instructed them to establish a Pennsylvania corporation to acquire all the assets or the stock of Commercial Distributors, Inc. During March most of the details of the acquisition were agreed upon. Preliminary drafts of the acquisition agreement, promissory note and a consulting agreement with Enelow were prepared and sent to the attorneys of Commercial Distributors, Inc. The petitioner met with suppliers of the products sold by Commercial Distributors, Inc., and among other things, arranged that a franchise with Commercial Distributors, Inc., be transferred to him or to a corporation controlled by him. On March 24, 1971, the petitioner transferred $125,000 from his bank *283 account in the Chase Manhattan Bank to his personal checking account in the Western Pennsylvania National Bank. Contemplating that his proposed corporation would be opening an account with that bank upon the signing of the contract of purchase, the petitioner, the other two officers of the new corporation (who were also officers of Commercial Distributors, Inc.) and the treasurer of the new corporation made out signature cards authorizing the bank to recognize any of the signatures in the payment of funds or in the transaction of any business. Articles of incorporation and by-laws for the new corporation were prepared and forwarded to Harrisburg, Pennsylvania, where it was to be incorporated. Also, a corporate name was reserved. The petitioner was physically present in Pittsburgh a total of 33 days during the period January 31, 1971 through April 14, 1971. During this time, he was personally active in the business. He worked on a daily basis with the sales managers of Commercial Distributors, Inc., deciding on a development program, travel plans, and prices for special bids to hospitals, schools and major chain businesses. He prepared a special bid on a major project. He rearranged *284 the inventory and worked with mechanics familiarizing himself with the physical aspects of the products that Commercial Distributors, Inc., was selling. He went along on installation, maintenance and repair calls. He collected some accounts. He assisted in the preparation of a layout for a forthcoming equipment and dealer show. He worked with the company's accountant on revised accounting procedures to go into effect after the acquisition and prepared detailed budgets for 1971 - 1972. In addition, Enelow introduced him to friends, business acquaintances, and customers as the future owner of Commercial Distributors, Inc. Early in April, the final drafts of the acquisition agreement, the promissory note and the consulting agreement were submitted to Enelow's attorneys. The closing date was set for April 30, 1971. About this same time, the petitioner began hearing rumors that another venture of Enelow's, "Barnacle Bill's, Inc.," was encountering financial difficulty. Barnacle Bill's was in the same building as, and was subleasing space from, Commercial Distributors, Inc. It was also purchasing all of its restaurant equipment from Commercial Distributors, Inc., which resulted in increased *285 sales for Commercial Distributors, Inc., during 1970. In addition, Barnacle Bill's owed Commercial Distributors, Inc., approximately $9,000. The petitioner also discovered that certain misrepresentations had been made to him. Some of the inventory which showed up as stock in the inventory of Commercial Distributors, Inc., actually belonged to Barnacle Bill's. This reduced the total assets of Commercial Distributors, Inc., by approximately $13,000. Some equipment which had been leased to Commercial Distributors, Inc., had been sold by Commercial Distributors, Inc., for cash. Certain repurchased equipment financed by a bank had been resold by Commercial Distributors, Inc., for cash without notification or repayment to the bank. Assessing these factors along with the information that Barnacle Bill's would be filing for bankruptcy, the petitioner decided to abandon the acquisition. He felt that since Enelow had a previous bankruptcy in 1966, this new bankruptcy would affect Enelow's credibility in the local market and this in turn would have an adverse affect on Commercial Distributors, Inc. All efforts to acquire the business were abandoned on April 16, 1971. The petitioner did *286 not purchase any property or options on property in connection with the acquisition of Commercial Distributors, Inc. No contracts or agreements were actually signed and no downpayment was made. Although the petitioner was introduced as the future owner of the business, he was never given any position or title therein. He never paid any bills on behalf of Commercial Distributors, Inc. No stationery or letterheads for the proposed new corporation were printed up and the new corporation was never actually incorporated. When the parties terminated the agreement in April, the petitioner made a trip to Florida. The petitioner testified that the trip took place early in April either a little before or a little after the transaction was terminated. He also stated that the purpose was to meet with Bennett Applebaum to get other information about Enelow and his relationship with Commercial Distributors, Inc., and to explain to Applebaum the petitioner's doubts about the deal. The possibility of another distributorship was mentioned but not followed up on. Petitioners claimed miscellaneous expenses on their 1971 return totaling $5,749 in connection with the acquisition of Commercial Distributors, *287 Inc. Such expenses included: Airline fares
$848.00
Train fares
72.00
Car rentals
201.00
Hotels
697.00
Tolls
85.00
Postage
32.00
Stationery
50.00
Gasoline
157.00
Miscellaneous
200.00
Legal fees
1,762.00
Accounting fees
1,200.00
Business Journal ad
25.00
Wall Street Journal ad
420.00
Total
$5,749.00
The respondent has conceded that $4,951.50 was spent in connection with petitioner's effort to acquire the business. The respondent contends that $797.50 spent for the advertisements in the Business Journal and Wall Street Journal and for the air fare to Florida in April were not expenses in connection with that acquisition. In addition, the respondent contends that none of the $5,749 is deductible. OPINION The petitioner claims that the expenses incurred by him in connection with the proposed acquisition of Commercial Distributors, Inc., are deductible either as business expenses pursuant to section 162(a)(2) or as expenses incurred for the production of income pursuant to section 212(1) or as losses incurred in a transaction entered into for profit pursuant to section 165(c)(2). With respect to the deductibility of the petitioner's *288 travel or business expenses, section 162(a)(2) provides, as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary year in carrying on any trade or business, including-- * * * (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; The expenses in question were incurred in searching for and investigating Commercial Distributors, Inc., with a view to purchasing that business. At the time, the petitioner was not engaged in any business. The expenses incurred were preparatory to locating and purchasing a business. For that reason, such expenses are not deductible under section 162(a) (2). George C. Westervelt,8 T.C. 1248 (1947); Morton Frank,20 T.C. 511 (1953). See also John F. Koons,35 T.C. 1092 (1961). Insofar as material herein, section 212 provides, as follows: SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary *289 and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; For the expenses to be deductible under section 212, the petitioner must have an existing interest in an income producing asset to which the expenses relate. See, Morton Frank,supra;Marion A. Burt Beck,15 T.C. 642 (1950), affd. 194 F. 2d 537 (1952); Stella Elkins Tyler, 6 T.C. 135 (1946). See also Caruso v. United States,236 F. Supp. 88 (D.N.J. 1964); section 1.212-1(g), Income Tax Regs. Until the transaction was completed and Commercial Distributors, Inc., was acquired there could be no production of income for the petitioner's benefit. Until that time the expenses were merely capital expenditures. Dwight A. Ward,20 T.C. 332 (1953); Mid-State Products Co.,21 T.C. 696 (1954). The expenses were incurred to acquire a business which might in the future be productive of income for the petitioners. See *290 McDonald v. Commissioner,323 U.S. 57 (1944). Lastly, the petitioner contends that the expenses in question are deductible as a non-business loss under section 165(c)(2). That section provides, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; While admitting that the petitioner had the requisite "profit motive," the respondent takes the position that the negotiations between the petitioner and Enelow did not reach the "transaction" stage. In substance, the respondent would restrict that term to the actual consummation of a contract. With this, we cannot agree. The losses claimed in this case were not expenses incurred in the search for a suitable business. Cf. *291 Morton Frank,supra. The petitioner thought that he had found such a business. There had been a meeting of minds between the petitioner and the seller with respect to the basis upon which the petitioner would acquire that business. The expenses were incurred by the petitioner in preparing to consummate the purchase. While subsequent developments compelled the petitioner to abandon the transaction, this is not a bar to the deduction of such expenses as having been incurred in a transaction entered into for profit within the meaning of section 165(c)(2). Harris W. Seed,52 T.C. 880 (1969); Charles T. Parker,1 T.C. 709 (1943). As a practical matter, the expenses incurred by the petitioner in this case are indistinguishable from the type of expenses incurred by the taxpayer in Harris W. Seed,supra. Without attempting to delineate precisely what stage of the negotiations gives rise to a "transaction," it is our opinion that petitioner comes squarely within the decision of this Court in *292 Harris W. Seed,supra. Upon the development of facts which compelled the petitioner to abandon his plans for the purchase of Commercial Distributors, Inc., the petitioner is entitled to deduct the expenses incurred in connection therewith as a loss under section 165(c)(2). However, the expenses the petitioners incurred in advertising in the Wall Steet Journal and Business Journal were not a part of the expenses incurred in the attempted acquisition of Commercial Distributors, Inc., and are not deductible as part of the loss. Likewise, as to the expense of the trip to Florida when the agreements were terminated, the petitioner has failed to show that this expense was related to the attempted acquisition. We find that these expenses are not part of the deductible loss. In accordance with the above, Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩