ESTATE OF W. BURGESS BOYD, DECEASED, AND MAXINE A. WESLEY (FORMERLY MAXINE A. BOYD), PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8058–78.    Filed April 23, 1981.

*Paul D. Ritter, Jr.*, for the petitioners.
*Stuart B. Kalb*, for the respondent.

DRENNEN, *Judge*: Respondent determined a deficiency in petitioners' income tax for the calendar year 1974 in the amount of $15,048.

The sole issue to be decided is whether a limited partnership, of which W. Burgess Boyd was a limited partner, incurred a loss in 1974, so that W. Burgess Boyd would be entitled to deduct his aliquot share. Whether the partnership incurred a loss in 1974 is dependent upon whether it is entitled to a deduction under sections 162 and 707 or 165, I.R.C. 1954,[1] for certain payments made in 1974 to the general partners of the partnership.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found. The stipulation of facts, the first supplemental stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

W. Burgess Boyd (hereinafter Boyd) and Maxine A. Wesley (formerly Maxine A. Boyd) were husband and wife during the taxable year in issue. Boyd died on April 19, 1975. Petitioner Maxine A. Wesley (hereinafter petitioner) is the personal representative of the Estate of W. Burgess Boyd, and she is a petitioner in this case in her individual capacity and as personal representative of the Estate of W. Burgess Boyd. Petitioner resided in Sarasota, Fla., at the time of the filing of the petition herein. Petitioner, individually and as surviving spouse, filed joint original and amended income tax returns for 1974 for herself and Boyd with the Office of the Director, Internal Revenue Service Center, Chamblee, Ga.

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year in issue.

## Background Facts

In 1974, Patrick Oil & Gas Corp. (hereinafter sometimes referred to as Patrick Oil) was the wholly owned subsidiary of Patrick Petroleum Corp. of Michigan (hereinafter Patrick of Michigan). Patrick of Michigan was the wholly owned subsidiary of Patrick Petroleum Co. (hereinafter Patrick). (Sometimes hereinafter Patrick, Patrick of Michigan, and Patrick Oil will be referred to collectively as the Patrick group.)

Patrick, Patrick of Michigan, and Patrick Oil comprise an independent oil and gas operation. As of November 15, 1974, the Patrick group had approximately 95 employees, including a professional staff of 36 engineers, geologists, and landmen. The employees were located at the Patrick group home office in Jackson, Mich., and at various offices in Texas, Kansas, Louisiana, Kentucky, West Virginia, Mississippi, Oklahoma, and Canada.

The exact areas of operations and activities of each of the members of the Patrick group, and the lines of demarcation (if any) between those areas, were never specifically detailed. Apparently, Patrick of Michigan is the entity actively engaged in the acquisition and sale of oil and gas properties. During the normal course of its operations, Patrick of Michigan purchases producing oil and gas properties and holds such properties in its inventory. Many properties are evaluated by Patrick of Michigan for possible acquisition, not all of which are acquired. In addition to having its own employees evaluate various properties, Patrick of Michigan has independent consultants evaluate properties which Patrick of Michigan is considering acquiring.

Patrick and Patrick Oil restrict their activities to organizing, establishing, and operating (as general partners) various types of limited-partnership programs for investing in oil and gas properties. Limited partnership interests are then sold to the public. Once a limited partnership is formed, producing oil and gas properties purchased by Patrick of Michigan are made available for acquisition by the limited partnership.

## Limited Partnership Formation

On September 12, 1974, Patrick Oil (as general partner and managing partner) and Patrick (as additional general partner) filed Registration Statement No. 2–51930 with the Securities

and Exchange Commission to register for sale units in the Patrick Oil and Gas Corp.—1975 Income Program. The registration statement became effective November 15, 1974. Under this income program, a series of limited partnerships were to be formed to acquire and operate producing oil and gas properties. The prospectus prepared in connection with the registration statement provided that at least one, but not more than four, limited partnerships would be formed.

The minimum amount necessary to form one limited partnership was $500,000 and the general partner guaranteed to make sufficient capital contributions or purchase suffcient limited partnership units to ensure the receipt of at least $500,000 for the first limited partnership. In addition, the general partner had the sole discretion to close sales for a limited partnership after the minimum amount necessary to form a limited partnership had been subscribed.

Between November 15, 1974, and December 31, 1974, 3,443 units in the Patrick Oil & Gas Corp.—1975 Income Program were sold, with total subscriptions equaling $1,721,500. As of December 31, 1974, units were owned by 199 record holders. On that date, sales of units in Patrick Oil & Gas Corp.—1975 Income Program, Limited Partnership No. 1 (hereinafter LP–1 or limited partnership) were closed and a limited partnership was formed under the laws of the State of Michigan. A certificate of formation for LP–1 was filed in the Office of Jackson County Clerk, Jackson, Mich., on December 31, 1974.

Boyd subscribed to purchase 200 units of LP–1 at $500 per unit, and he paid a total subscription price of $100,000 to the partnership in 1974. His aliquot share of all items of limited partnership income, loss, deduction, or credit in 1974 was 5.808888 percent of the total of such items.

The limited partnership agreement for LP–1 provided that the purpose of the limited partnership was "to purchase and operate producing oil and gas properties and to conduct all other operations relating thereto." The limited partnership would not engage in exploratory or developmental drilling for oil and gas. Profits and losses were to be determined according to the cash basis of accounting. As general and managing partner, Patrick Oil was to conduct and manage the activities of LP–1 and was given authority "to do any and all things necessary or appropriate in order to accomplish the purposes" of the limited partner-

ship. Patrick Oil and Patrick were also given the right of first refusal with regard to sales of LP–1 units by the limited partners. Dissolution of LP–1 would be effected upon the occurrence of a number of specified events, but in any event it would terminate on April 30, 2021.

The limited partnership agreement, to a brief extent, provided that producing oil and gas properties could be purchased from entities affiliated with Patrick Oil. More detailed information concerning the acquisition of producing properties was provided in the prospectus prepared in connection with the sale of the limited partnership units in Patrick Oil & Gas Corp.—1975 Income Program. In the prospectus it was stated:

Acquisition of Properties

The Partnerships will not engage in drilling. Their activities will be limited to purchasing, holding, operating and disposing of producing oil and gas properties. The Partnerships may purchase any kind of interest in a producing oil and gas property. In most cases a working interest will be acquired which will consist of all or part of the rights and obligations under an oil and gas lease. Occasionally a Partnership may purchase overriding royalty interests, production payments or royalty interests.

As has been the practice in all previous programs the Partnership will purchase all of their interests in producing oil and gas properties from Patrick Petroleum Corporation [of Michigan] or Patrick Petroleum Company, parents of the General Partner which may purchase them from individuals, independent oil companies, major oil companies, estates, trusts, partnerships including Partnerships in other Patrick Oil and Gas Corp. programs or other entities.

      *        *        *        *        *        *        *

Possible producing oil and gas properties to be purchased by the Partnerships will be located through the ten exploration offices maintained by Patrick Petroleum Corporation [of Michigan] and through contacts developed by the General Partner and its affiliates during the past 11 years of operation with lease brokers, individuals, banks, and others who may have knowledge of properties for sale. No finders fees will be paid to the General Partner and affiliates.

Producing oil and gas properties available for purchase will be evaluated by the General Partner's technical staff and also by independent petroleum engineers and geologists. These evaluations will be used to determine the desirability of acquiring a property available for sale and the possible purchase price to be paid by the Partnership. The possible purchase price will be determined by generally accepted evaluation techniques used in the petroleum industry. The General Partner may consider future price increases or decreases in crude oil and natural gas in determining the price to bid for Properties.

The actual purchase price for properties owned by unrelated parties will be determined through negotiations by the General Partner with the owner of the property. Properties transferred to a Partnership by an affiliate of the General Partner, which were acquired more than one year before the formation of the

Partnership, shall be sold at cost unless the General Partner believes the market value would be higher or lower than cost. In such a case, the property is to be evaluated by a qualified independent petroleum engineer and sold at market value. Any properties acquired by an affiliate within one year prior to or after formation of the Partnership and sold to the Partnership shall be sold at cost unless the General Partner believes the market value would be lower than cost. In such case the property is to be evaluated by an independent petroleum engineer and sold at the lower of cost or market value. The sale to the Partnerships of properties by affiliates of the General Partner may result in profit. * * *

Following the payment of certain fees, *infra*, the limited partnership would have 85 percent of its total subscriptions to invest in oil and gas properties. The limited partnership agreement provided:

The General Partner may spend the 85% of Partnership monies for the following costs and expenses with respect to the acquisition and operations of Producing Properties:

(1) Fees for geological, geophysical, engineering and other technical services after acquisition;

(2) Purchase price of producing leases or other oil and gas interests to be acquired, with any depreciable equipment thereon;

(3) Fees for searching, perfecting and maintaining title;

(4) Testing expenses; and

(5) Any and all other costs and expenses incurred by the General Partner with respect to the acquisition of Producing Properties.

During 1975, LP–1 acquired by purchase from Patrick of Michigan a 14.2-percent working interest in and to a producing oil and gas property known as the Nassau property. This interest was the only oil and gas property acquired by the limited partnership.

The Nassau property, which Patrick of Michigan had purchased in October 1974 from the Nassau Oil Co. and had in its inventory of oil and gas properties on December 31, 1974, consisted of approximately 90 separate leases with respect to property located in Oklahoma, Texas, Louisiana, Arkansas, and Wyoming. The majority of the wells in the Nassau property had an estimated future economic life of less than 10 years from the date Patrick of Michigan purchased the property. Some wells had no estimated economic life and some had estimated lives in excess of 20 years. At the time the Nassau property was evaluated and acquired by Patrick of Michigan, it was not known whether it, or any interest therein, would be sold to any

limited partnership. Ultimately, a total of six different limited partnerships purchased interests in the Nassau property.

Patrick of Michigan performed certain in-house legal, accounting, and other professional services in connection with the acquisition of the Nassau property. The services performed included: Evaluation of the property by petroleum engineers; review of title and provision for receipt of clear title to the property; review of the financial and tax aspects of the purchase; executive management review of the purchase and determination of an appropriate purchase price; and closing of the purchase. In addition, Patrick of Michigan also paid amounts to third-party brokers, engineers, and attorneys in connection with the acquisition of the Nassau property.

In its search for operating oil and gas properties to acquire during 1974, officials of Patrick and Patrick of Michigan evaluated over 100 different properties brought to their attention. These properties were not related to the Nassau property. In many instances, the evaluations were peremptory; in other instances, more information was obtained before the evaluations were completed. Patrick of Michigan acquired four of the properties evaluated in 1974.

The purchase price paid by LP–1 for its interest in the Nassau property equaled 14.2 percent of the sum of (a) the purchase price paid by Patrick of Michigan to the Nassau Oil Co., and (b) the additional costs incurred by Patrick of Michigan for services rendered by third parties in connection with the acquisition of the Nassau property. LP–1 did not pay any amounts directly to third parties, nor did the purchase price include any amounts for the in-house services rendered by Patrick of Michigan in the acquisition of the Nassau property.

The actual document transferring the 14.2-percent property interest was not signed until December 31, 1975, although the transfer was stated to be effective as of January 1, 1975. In actuality, the purchase of the 14.2-percent interest entailed the performance of an in-house bookkeeping procedure after it was determined how much LP–1 had to invest in oil and gas property, and that such amount equaled 14.2 percent of the "costs" (purchase price plus third-party costs) of the Nassau property. A 14.2-percent interest in the Nassau property was later recorded during January 1975 on Patrick of Michigan's books as belonging to LP–1 as of January 1, 1975, and LP–1 was

credited and debited with 14.2 percent of the income and expenses of the Nassau property for 1975.

## *Compensation of General Partners*

The limited partnership agreement and the prospectus provided that the general partners of LP–1 were to receive the following nonrecurring fees from LP–1, stated in percentages of the total subscriptions:

(a) 15-percent contribution fee, "which amount shall be considered earned," and which fee was to be reinvested in the limited partnership as a capital contribution by Patrick Oil;

(b) 8.5-percent management fee; and

(c) 6.5-percent overhead fee for certain overhead expenses.

These nonrecurring fees were to be borne 99 percent by the limited partners and 1 percent by the general partners, Patrick Oil and Patrick.[2]

Neither the limited partnership agreement nor the prospectus identifies in detail the services or expenses for which Patrick Oil received the 15-percent contribution fee. Other evidence indicates that the payment was designed to:

(a) Reimburse Patrick and Patrick Oil for indirect organizational expenses of the limited partnership, including, for example, accounting costs incurred in preparation of the prospectus; in-house legal and other costs incurred in preparation of the prospectus and registration statement; and sales commissions to representatives who acted as wholesalers of limited partnership units;

(b) Compensate Patrick and Patrick Oil for services rendered and costs incurred, during the period November 15 to December 31, 1974, in opening bank accounts in LP–1's name and in preparing a mailing list containing all the limited partners' names; and

(c) Compensate Patrick and Patrick Oil for the operation of the limited partnership after its formation.

Both the prospectus and the partnership agreement provided

---

[2]Pursuant to the prospectus, Patrick Oil was also entitled to receive a monthly "per-well" charge for services provided in connection with the operation of producing oil and gas properties. Neither party made note of this fee, however, nor did they argue that it had any bearing on the disposition of the issue presented. Accordingly, we will make no further reference to it.

that Patrick Oil would reinvest the 15-percent fee in the partnership for a 15-percent interest therein, and this was done.

No estimate was provided in either the limited partnership agreement or the prospectus as to the amount of the indirect organizational expenses, the cost of operating LP–1 from November 15 to December 31, 1974, or the cost of operating LP–1 in the future for which the 15-percent contribution fee would provide reimbursement. Nor was there any evidence as to the amount actually expended for those services. Similarly, no evidence was provided of the yearly value of the services to be provided by Patrick and Patrick Oil during the existence of LP–1, although both parties agree that it was possible to estimate reasonably the value of those services.[3]

The 8.5-percent management fee represented a payment for the cost of commissions on the sale of subscriptions to the limited partnership. These commissions were paid by the general partner to the dealer-manager, Patrick Program, Inc., of the limited partnership.[4]

The 6.5-percent overhead fee was described in the prospectus as follows:

> The General Partner [Patrick Oil] and its affiliates will provide to the Partnership geological, engineering and other technical services. The costs incurred by the General Partner and its affiliates in providing these services as well as part of their administrative overhead will be paid for by the nonrecurring 6½% payment for overhead expenses * * * . All technical services provided by unrelated parties will be paid for directly by the Partnership.

It was further stated in the prospectus that the payment of the 6.5-percent fee could result in profit or loss to Patrick Oil and Patrick.

The limited partnership agreement provided that the 6.5-

---

[3]Petitioners' witness, a CPA and treasurer of Patrick, estimated that the indirect organizational expenses incurred by the general partner in organizing LP–1 was about $20,000 to $21,000, that the value of the bookkeeping and other day-to-day services rendered by the general partners for the benefit of LP–1 from Nov. 15, 1974, to Dec. 31, 1974, was $3,500, and that the estimated expenses of operating LP–1 over the years of its existence would be $24,000 for the first year, $12,000 per year over the next 9 years, and $6,000 per year thereafter. However, he did not adequately explain the basis of these estimates.

[4]Petitioners conceded at the opening of the trial that the 8.5-percent "management" fee should be capitalized and is not deductible.

percent fee would "be used for the following overhead expenses":

(1) The cost of geological, geophysical, engineering and other technical services performed by the General Partner for the purposes of evaluating any oil and gas property which the General Partner is considering acquiring with the Proceeds;

(2) The cost of all legal, accounting and other professional services rendered in connection with the organization of the Partnership;

(3) The cost of all legal, accounting and other professional services rendered by the General Partner or its affiliates in connection with the acquisition of properties with the Proceeds for the Partnerships.

No portion of the 6.5-percent fee was attributable to geological or geophysical costs because the limited partnership was formed to invest in producing oil and gas properties, the acquisition of which did not require such services, rather than in exploring and developing properties, the acquisition of which would require such services.[5]

On December 31, 1974, the date of its formation, LP–1 paid to Patrick Oil the three fees required under the prospectus and the limited partnership agreement. These fees were in the following amounts:

| Item | Amount |
|------|--------|
| Contribution fee | $258,225 |
| Management fee | 146,327 |
| Overhead fee | 111,898 |
| | 516,450 |

On the same day, Patrick Oil reinvested the 15-percent contribution fee in the limited partnership.

The amount and type of fees paid to these general partners were comparable to the fees paid to other general partners under similar limited partnership oil and gas investment programs marketed by competitors of the Patrick group. During 1974, Patrick Oil was one of the larger marketers of investment programs which invested in producing oil and gas properties.

On its tax return for the taxable year ended December 31,

---

[5]Of the $111,898 total of the 6.5-percent overhead fee, petitioners capitalized $10,675 as organizational costs. Petitioners' witness, Simon, vice president of both Patrick and Patrick Oil, estimated that the indirect cost of acquiring the Nassau property was about $33,000, 14.2 percent of which, or $4,686 should also be allocated to LP–1. Six Patrick programs purchased an interest in the Nassau property.

1974, LP–1 deducted the following of the fees paid to Patrick Oil:

| Item | Amount |
| --- | --- |
| Contribution fee | $258,225 |
| Management fee | 146,327 |
| Overhead fee | 101,223 |
| | 505,775 |

The only portion of the $516,450 payment not deducted was $10,675 of the overhead fee, which amount was capitalized as an organizational expense. Other than the various fees deducted, no other income or expense items were reported on the partnership return. Thus, a net loss equal to the total of the foregoing deduction resulted.

On the returns filed for 1974, petitioner deducted an aliquot share, $29,086,[6] of the net loss reported on the limited partnership's return.

In the statutory notice of deficiency, respondent disallowed the entire deduction taken by petitioner as a share of the limited partnership loss on the ground that it had not been established that the limited partnership had sustained any deductible loss.

### OPINION

On December 31, 1974, the day on which it was formed, LP–1 paid to its general partners the sum of $516,450 as fees for certain costs incurred and services rendered in organizing the limited partnership, and for other services, including all future services necessary for operating the limited partnership. The $516,450 amount equaled 30 percent of total subscriptions to limited partnership units and consisted of: (a) 15-percent contribution fee of $258,225; (b) 8.5-percent management fee of $146,327; and (c) 6.5-percent overhead fee of $111,898. Pursuant to the limited partnership agreement, the general partner was required to, and did, reinvest the 15-percent contribution fee in the limited partnership.

On its income tax return for the tax year ended December 31, 1974, the limited partnership deducted $505,775 of the total fees

---

[6]Because under the limited partnership agreement the limited partners were to bear 99 percent of any loss while the general partners were to bear 1 percent, petitioner's share of the loss equaled 5.808888 percent of (99 percent × $505,775).

paid to the general partner as a business expense. The only portion of the fee not deducted was $10,675 of the 6.5-percent overhead fee, which amount was capitalized as an organizational expense. There being no other items of income or expense reported on the return, the amount deducted gave rise to a loss in an equal amount.

As a result of her husband's ownership of limited partnership units in LP–1, petitioner deducted on the joint return filed for her and her husband an aliquot share of the loss reported by the limited partnership. In the statutory notice of deficiency, respondent disallowed the entire deduction claimed by petitioner as a share of the partnership's loss on the grounds that it had not been established that the partnership had incurred any loss.

The issue for decision is the proper tax treatment to be accorded the various fees paid by LP–1 to its general partners. Petitioner has conceded that the 8.5-percent management fee paid and deducted by LP–1 is a nondeductible capital expenditure for commissions paid to sellers of subscriptions to limited partnership units. See *Brountas v. Commissioner*, 73 T.C. 491 (1979). The issue has thus narrowed to whether the limited partnership can properly deduct the 15-percent contribution fee and any portion of the 6.5-percent overhead fee.

The 6.5-percent and 15-percent fees were nonrecurring and were determined by reference to the total subscriptions to limited partnership units and not by reference to the income of the limited partnership.

Both parties agree that the fees were guaranteed payments pursuant to section 707(c).[7] To be deductible by the limited partnership, the fees must satisfy the requirements of section 162 as if they were paid to an unrelated party. Sec. 707(c); *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976); *Kimmelman v. Commissioner*, 72 T.C. 294 (1979). Section 162(a) generally allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." In determining whether any portion of the fees in question are deductible under section

---

[7]Sec. 707(c) provides:

(c) GUARANTEED PAYMENTS.—To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and section 162(a) (relating to trade or business expenses).

162(a), "we look to the nature of the services performed [for which the fees were paid] * * * rather than to their designation or treatment by the partnership." *Cagle v. Commissioner, supra* at 96; see also *Kimmelman v. Commissioner, supra* at 305. Petitioner bears the burden of establishing which fees, or portions thereof, are deductible. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). For convenience we will separately discuss the 6.5-percent and 15-percent fees.

### 6.5-Percent Fee

The prospectus and the limited partnership agreement outline the services and costs for which the 6.5-percent overhead fee was intended to be paid: (1) Engineering and other technical services (including a share of administrative overhead expenses) for evaluating oil and gas properties (hereinafter evaluation services); (2) in-house legal and other professional services for acquiring oil and gas properties (hereinafter acquisition services); and (3) legal and other professional services for organizing the limited partnership (hereinafter organizational services). There is no dispute between the parties as to the general proposition that services in each of the foregoing categories were rendered by some member of the Patrick group and that such services in some way benefited LP–1. The dispute concerns whether the fee was actually paid for such services and, if so, the allocation of the fee among the three categories and the proper characterization for tax purposes of each of the allocated portions of the total fee.

Petitioner's allocation and characterization of the 6.5-percent fee begins with the $10,675 portion of this fee which LP–1 capitalized on its tax return as organizational expenses. This amount, petitioner contends, was properly capitalized and represented the cost for organizational services. The remainder of the fee ($101,223) is divided by petitioners between the other two categories of services mentioned above and in the partnership agreement. This division between evaluation services and acquisition services is based on the following reasoning: (1) Patrick of Michigan performed certain in-house legal and other professional services in acquiring the Nassau property and these services had a cost of $33,000; (2) LP–1 acquired a 14.2-percent interest in the Nassau property, the "purchase price" of which did not

include any amount for Patrick of Michigan's in-house professional services; and (3) it is reasonable to allocate the indirect costs in acquiring the Nassau property to the holders of interests in the Nassau property in the same proportion as the holder's interest in the Nassau property. Petitioner concludes from this reasoning that 14.2 percent of the $33,000 in costs, or $4,686, should be allocated to LP–1 as the portion of the 6.5-percent fee attributable to acquisition services, and should be capitalized. Because the $4,686 amount includes costs for in-house engineering evaluation services, as well as other professional services, rendered with respect to the Nassau property, petitioner argues that the balance of the fee ($96,537), therefore, must be for evaluation services in connection with oil and gas properties which were not ultimately acquired. Since expenses for services of this type may be deductible if the property evaluated is not acquired (see *Seed v. Commissioner*, 52 T.C. 880 (1969)), petitioners assert that this $96,537 amount is likewise properly deductible by the limited partnership.

Respondent contends that no portion of the 6.5-percent overhead fee is deductible because the entire fee must be capitalized as a cost attributable either to the organization of the limited partnership or to the acquisition by the limited partnership of a capital asset, its interest in the Nassau property. No part of the fee, respondent argues, was reimbursement for evaluation services performed by Patrick of Michigan for LP–1.

For a variety of reasons, we conclude the entire 6.5-percent fee must be capitalized.

Petitioner apparently concedes that any part of this fee that is allocable to organizational expenses and acquisition costs must be capitalized, and we agree. *Woodward v. Commissioner*, 397 U.S. 572, 576 (1970); *Kimmelman v. Commissioner, supra.* As noted above, LP–1 did capitalize a part of this fee on its return as organizational expense. And on brief, petitioner acknowledged that a part of the fee allocated to acquisition costs should also be capitalized. However, petitioner allocates rather small portions of this fee to organizational and acquisition costs, and claims that all the rest of the fee ($96,537) was paid for evaluation services and is deductible under sections 707(c) and 162. We will discuss the allocation later.

Even if we assume that the $96,537 was paid for evaluation services, we are of the opinion that, as a matter of law, these

expenses are not currently deductible. Under the partnership agreement, in addition to reimbursement for organizational and acquisition costs, the 6.5-percent fee was to be used for the "cost of geological, geophysical, and other technical services performed by the General Partner for the purpose of evaluating any oil and gas property which the General Partner is considering acquiring." Since the partnership was acquiring only operating wells, no geological or geophysical services were necessary or performed; in fact, it is not clear what technical services were performed, unless the evaluation process is considered a technical service. As we understand the evidence, the evaluation services were performed by employees of either Patrick or Patrick of Michigan, and consisted of reviewing and evaluating a number of operating oil and gas properties to find those that would be suitable as investments by limited partnerships such as LP-1. During an undisclosed period of time prior to the formation of LP-1, over 100 properties were evaluated, and Patrick of Michigan acquired four or five of them, including the Nassau property. At the time the Nassau property was acquired by Patrick of Michigan in October of 1974, it was not decided that it or any interest in it would be sold to LP-1. The decision to sell an interest in it to LP-1 was not made until it was known how much would be subscribed in LP-1.

As previously noted, to qualify for a deduction as a guaranteed payment under section 707(c), a payment by a partnership to a partner must satisfy the requirements of section 162 as if it was paid to an unrelated party. Furthermore, it must not run afoul of section 263 under which a payment made for a capital asset is not currently deductible even though it might otherwise be considered an ordinary and necessary business expense. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 17 (1974); *Cagle v. Commissioner, supra; Kimmelman v. Commissioner, supra; Honodel v. Commissioner,* 76 T.C. 351 (1981). Whether a guaranteed payment is deductible by the partnership depends on the character of the payment viewed at the partnership level and depends on the nature of the services performed for the payment. *Cagle v. Commissioner, supra.*

While the prospectus for LP-1 suggested that oil and gas properties would be purchased from the parents or affiliates of the general partner, there is nothing specific to suggest that LP-1 would pay for all the evaluation work done by Patrick of

Michigan before it purchased a property. It may be that in order to be certain that a particular oil and gas property will be a good investment, evaluations of other properties must be made, but that was the business of Patrick of Michigan, not that of LP–1. LP–1 was not even in existence when the evaluation work was done. Its business was to be that of operating already developed oil and gas properties acquired from the general partner or its affiliates. Any portion of the fee allocated to evaluation services was not an ordinary and necessary business expense of LP–1; at most it could be considered an investigatory and preacquisition cost of acquiring a capital asset, an interest in the Nassau property, which must be capitalized. *Woodward v. Commissioner, supra* at 575–576; *Cockburn v. Commissioner*, 16 T.C. 775 (1951).

Petitioner also claims that the part of the fee allocated to evaluation of properties that were not acquired is deductible under section 165(a) as losses incurred in a trade or business or in a transaction entered into for profit.

In *Seed v. Commissioner*, 52 T.C. 880 (1969), it was held that where a taxpayer committed himself to buy stock in a savings and loan business if a charter could be obtained, he was entitled to deduct the expenses incurred in seeking a charter as a loss in a transaction entered into for profit when the corporation failed to receive a charter and the project was abandoned. See also *Larsen v. Commissioner*, 66 T.C. 478 (1976). The issue in *Seed* was whether there was a "transaction," and the Court concluded that since the taxpayer had committed himself to buy the stock if a charter was obtained, it was a "transaction" and gave rise to a loss when the transaction was abandoned. In this case, LP–1 did not commit itself to buy any of the properties evaluated by Patrick of Michigan and it did not enter into transactions with respect to the properties not acquired. Hence, there was no abandonment that would give rise to a loss.[8]

In *Larsen v. Commissioner, supra*, the taxpayers incurred expenses in attempting to obtain oil and gas leases on specific properties within a given area. Some leases were obtained and others were not. We held that the expenses incurred in attempting to obtain the leases that were not obtained could be

---

[8]We are not here concerned with how such expenses should be accounted for by Patrick of Michigan.

deducted currently under section 165 and need not be added to the bases of the leases that were obtained. *Larsen* is readily distinguishable from this case wherein the expenses are claimed to have been incurred in evaluating unspecified properties rather than in attempting to lease specific properties.

This case is more like *Frank v. Commissioner*, 20 T.C. 511 (1953), wherein this Court denied a deduction for expenses incurred in looking for a newspaper to buy. The Court pointed out that the taxpayers were not engaged in any trade or business when the expenses were incurred and the expenses were not related to the conduct of any business they were then engaged in but were preparatory to locating and entering a business, and hence were nondeductible. See also *Galt v. Commissioner*, 19 T.C. 892 (1953), affd. in part and revd. on another issue 216 F.2d 41 (7th Cir. 1954). Such is the situation here. The evaluation expenses here involved might be deductible as ordinary and necessary business expenses of Patrick of Michigan because locating and buying oil and gas properties was its business, but LP–1 was never intended to be in the business of locating and buying properties. Consequently, we conclude that no part of the 6.5-percent fee was deductible by LP–1 or petitioner in 1974.

Even if we assume that the 6.5-percent fee was paid for the types of services (organization, acquisition, and evaluation) claimed by petitioner and that a single fee paid for both acquisition services and evaluation services is divisible, that it is insignificant that the evaluation services were performed prior to the formation of the partnership by an entity not a general partner, and that the evaluation services were ordinary and necessary business expenses of the partnership, there is no substantive evidence which establishes the extent or value of the evaluation services actually performed on behalf of LP–1 or which supports the manner in which petitioner allocates the fee among the three categories of services.

Initially, we recognize from evidence presented that the overhead fee was set as a result of the experience of the Patrick group in the oil and gas business and was reasonable in that it was comparable to the fees paid to general partners in similar oil and gas investment programs marketed by competitors of the Patrick group. But this does not aid us in allocating the fee among the three types of services called for, two of which are

admittedly not currently deductible, and the third of which is in dispute on that point. Petitioner has the burden of proving not only the deductibility of the fee but also the amount paid for the services she claims gives rise to a current deduction.

Petitioner seeks to establish the portion of the 6.5-percent fee allocable to the evaluation services, which she claims is deductible, by subtracting from the total fee specific amounts for organizational and acquisition services and attributing the balance to evaluation services. We cannot accept this method of allocating the fee. One fee was paid for all three categories of service, and it was fixed as a percentage of the total subscriptions made to the partnership. No portion of the fee was attributed to any particular service, and we have no way of knowing the relative values of the organizational, acquisition, and evaluation services. Determining the costs of two of the three categories of services for which the fee was paid does not allow the cost of the third category to be ascertained by subtracting from the total fee the cost of the other two categories. It is fairly obvious that the amount of the fee had no relationship to the cost of the services because once the $500,000 minimum subscriptions called for in the income program were obtained, subscriptions could be terminated by the general partner any time it pleased. They were actually cut off on December 31, 1974, so the amount of fees could be ascertained and paid in the year 1974. Under petitioner's method of allocation, 6.5 percent of all subscriptions received in excess of $15,361 ($10,675 + $4,686) would be allocated to evaluation services.

Furthermore, no evidence was presented as to which services or costs were included in the $10,675 organizational cost that was capitalized on the partnership return or what, if anything, differentiated organizational expenses attributed to the 6.5-percent fee from those attributed to the 15-percent fee. And finally, the determination of the total in-house acquisition costs incurred in Patrick of Michigan's purchase of the Nassau property is at best the result of assumptions about the employee hours involved and the cost of those hours, with no documentary evidence to support it.[9]

---

[9]We seriously doubt that the overhead fee was specifically related to any of the costs of the services rendered by the general partner or Patrick of Michigan. We believe the amount of the

In summary, we conclude that petitioner has failed to prove that the limited partnership was entitled to deduct any portion of the 6.5-percent overhead fee.

## 15-Percent Fee

Neither the prospectus nor the limited partnership agreement provides much detail as to the expenses or costs for which the 15-percent contribution fee was paid.[10] Thus, the parties initially locked horns on the question of which services were provided in return for the payment of this fee, as well as on the question of the portion of the fee to be allocated to the various categories of services.

Based on the testimony of officers of Patrick and Patrick of Michigan, petitioner claims the payment of the 15-percent contribution fee had two general purposes, reimbursement for nondeductible organizational expenses and compensation for services, "which amount shall be considered earned."[11]

The nondeductible organizational expense component of the fee, in the estimated amount of $20,000, according to petitioner, was for in-house services in preparing the registration statement, prospectus, and limited partnership agreement; and for

---

fee was a percentage of the total subscriptions which the Patrick group, through its experience in putting together these sorts of ventures, thought would be considered reasonable by potential investors, and that the investors paid the fee as a part of their cost of acquiring interests in the venture. See *Honodel v. Commissioner*, 76 T.C. 351 (1981).

[10]Abstractly, we have trouble understanding why this 15-percent fee was paid, except to produce a loss to the partnership and deductions for the investors in 1974, i.e., for tax shelter purposes, or to avoid problems that might arise under partnership tax law upon the transfer of a partnership interest in exchange for services. The general partner was required to reinvest the 15 percent in the partnership immediately, so the partnership and the general partner were in the same cash position immediately after the transaction as they were in before. The general partner received a temporarily subordinated interest in the partnership in return for its contribution to the partnership but the same result could have been accomplished, and frequently is, by providing in the partnership agreement that the general partner would participate in the partnership or the production from the property to a specified extent without making a cash contribution. We recognize that taxpayers may arrange their affairs in a manner that will be most beneficial to them taxwise, but we also know that substance must prevail over form for tax purposes. As indicated in the discussion that follows, petitioner claims that this 15-percent fee was to reimburse the general partner for expenses it incurred or to compensate it for various services it was to perform, but the fact is that the general partner presumably had none of this fee available to use for any of these purposes. Compare *United States v. General Geophysical Co.*, 296 F.2d 86 (5th Cir. 1961).

[11]While the partnership agreement says the 15-percent fee "shall be considered earned," this does not make it earned in fact, which is the inquiry for tax purposes. The statement is belied by other statements in the agreement that the fee was in part to compensate the general partner for services rendered in operating LP–1 in the future.

fees payable to selling representatives who acted as wholesalers in the sale of limited partnership units. Petitioner's $20,000 figure was comprised of the following amounts:

*In-house expenses:*

| | |
|---|---:|
| Accounting | $500 |
| Executive | 2,000 |
| Legal | 2,500 |
| | 5,000 |
| *Selling fees* | 15,000 |
| | 20,000 |

All of these costs figures were estimates. No evidence was introduced to differentiate these services from those originally capitalized as a portion of the 6.5-percent fee.

Petitioner characterized the remainder of the 15-percent contribution fee as being a deductible business expense for services rendered or to be rendered by the general partners. Petitioner claims the services were of two types, the first being the "day-to-day" (to use petitioner's phrase) operation of LP–1 from November 15, 1974, through December 31, 1974. These services, with an estimated value of $3,500, consisted of establishing appropriate bank records and mailing lists for the limited partnership, and of receiving and maintaining cash belonging to the limited partnership.

According to petitioner, the second component of the remainder of the 15-percent contribution fee, calculated by petitioner to be in the amount of $234,725, was paid to the general partners for, in effect, future services. These included (a) obligations under the limited partnership agreement to operate LP–1; (b) risks of liability under Michigan law for obligations incurred by LP–1 and for liabilities arising out of the operation of the limited partnership; (c) risk of claims brought by limited partners in regard to the sale of limited partnership units; (d) risk of loss of investment; (e) commitment of resources to provide LP–1 with $500,000 of subscriptions, to repurchase limited partnership units, and to maintain sufficient net worth as required by Rev. Proc. 72–13, 1972–1 C.B. 735, so that LP–1 would be taxed as a partnership rather than as an association taxable as a corporation; and (f) forbearance from acquiring producing oil and gas properties for their own account because of conflict of interest considerations.

Respondent agrees that one of the purposes of the 15-percent contribution fee was to reimburse the general partners for indirect organizational expenses of the limited partnership and that any part of the fee properly allocated for such expenses should be capitalized, as petitioner now contends. We also agree that as a matter of law, any portion of this fee properly attributable to organizing and setting up the partnership is not deductible by the partnership. *Cagle v. Commissioner, supra*; *Kimmelman v. Commissioner, supra*. See also the opinion of the Court of Claims Trial Judge in *Blitzer v. United States*, Ct. Cl. No. 426–76 (Trial Div., Mar. 12, 1981), 47 AFTR 2d 8–1005, 81–1 USTC par. 9262, for a discussion of the deductibility of amounts paid by a limited partnership for services prior to its conduct of business.

Respondent also agrees that one of the purposes of the 15-percent fee was to reimburse the general partners for the "day-to-day" operation of the limited partnership. He argues, however, that there is no evidence of record to support a finding that the value or costs of these services equaled $3,500. Moreover, and more importantly, he contends that LP–1 was not in operation prior to its formation on December 31, 1974, and, therefore, any expenditures for "day-to-day" operating services would be for capitalizable preoperating expenses.

While this issue is not without doubt, we believe any portion of the fee attributable to services rendered in the "day-to-day" operation of LP–1 between November 15, 1974, and December 31, 1974, would either be organizational costs or preoperational costs, both of which are required to be capitalized. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), remanded on other grounds 382 U.S. 68 (1965); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 566–567 (1979), affd. 633 F.2d 512 (7th Cir. 1980). Until business operations were commenced, no trade or business was being carried on by LP–1, as required by section 162(a). Although the question of when business operations commence is a question of fact (*Madison Gas & Electric Co. v. Commissioner, supra, Goodwin v. Commissioner*, 75 T.C. 424 (1980)), it seems clear that LP–1's operations did not begin before it was formed. The fact that the actual payment of the fee did not occur until after LP–1 was formed does not alter our view because LP–1 did not acquire any

assets with which to conduct business until 1975 and the services were performed before either of those events.

Finally, in reply to petitioner's characterization of the lion's share of the 15-percent fee as compensation for the general partners' undertaking of various obligations and risks, respondent contends: (a) There is no evidence to support a finding that one of the purposes of the fees was to compensate the general partners for undertaking the risks claimed by petitioner to have been undertaken; and (b) although the fee was intended to compensate the general partners for their services, these services were either with respect to the acquisition of properties, compensation for which must be capitalized under section 263, or were to be performed in taxable years subsequent to 1974, compensation for which must be deducted in the year when the services are performed so as not to violate the clear-reflection-of-income standards of section 446(b).

We agree that the 15-percent fee was paid to the general partner either for services rendered in putting the project together, which would be capitalized organizational or acquisition expenses so far as the partnership was concerned, or for services to be rendered in the future, which would not be deductible by the partnership in 1974. *Bassett v. Commissioner*, 26 T.C. 619 (1956); *Syracuse Washing Machine Corp. v. Commissioner*, 17 B.T.A. 11 (1929); *Farming Corp. v. Commissioner*, 11 B.T.A. 1413 (1928). Section 162(a)(1) includes within ordinary and necessary business expenses compensation for services "actually rendered." This would seem to contemplate that the services will be rendered in the taxable year. We recognize that the precise matching of income and the expenses of producing same in the same year is not required. But in our opinion all of the risks, obligations, commitments, and services relied upon by petitioners to support this fee as an ordinary and necessary business expense, which we have enumerated above, will be undertaken and rendered by the general partner throughout the existence of the LP–1 partnership and that it would be a gross distortion of income to permit a deduction of the entire fee in the year 1974.

Furthermore, as was the case with the 6.5-percent overhead fee, petitioner allocates the largest part of the total fee ($258,225) to an arguably deductible category of services by subtracting smaller amounts for other categories of services

from the total fee. Again there is no assurance that this method of proof accurately determines the portion of the fixed fee which should be allocated to the services in question. It has no relation to the relative costs of the services involved and there is no independent evidence from which the relative cost or value of those services can be ascertained or which would serve to test the accuracy of petitioner's method. Petitioner's witness, Swistock, a CPA and treasurer of Patrick, did testify that it was possible to estimate the costs of carrying out Patrick Oil's responsibilities under article XI of the partnership agreement, and that he estimated the cost to be $24,000 for the first year, $12,000 for each of the next 9 years, and $6,000 per annum thereafter. No evidence was offered to support this estimate and at best it simply suggests that a large part of the cost of rendering the services would be incurred many years after 1974. There is no evidence that would reasonably support an allocation of any part of the 15-percent fee to the services rendered to the partnership on the one day of its existence in 1974 before it began operating as a business.

In summary, petitioner has failed to establish with any reasonable certainty the services actually rendered in return for the receipt of the 15-percent fee, or the portion of the fee that should be allocated to any particular service, or that any amount allocated to any particular service or activity should be deductible by the partnership in 1974.

Having concluded that no portion of either the 6.5-percent or the 15-percent fee is deductible, and petitioner having conceded that the 8.5-percent fee was not deductible, we find that LP–1 had no loss for 1974 of which petitioner is entitled to a distributive share. Consequently,

*Decision will be entered for the respondent.*