WILLIAM T. EGOLF AND HARRYLOU EGOLF, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3640-83.          Filed July 2, 1986.

---

*John J. Griffin, Sr.* and *Laurence J. Whalen,* for the petitioners.

*Manolo T. Rodriguez-Bird,* for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income taxes for the taxable years 1978 and 1979 in the amounts of $112,628.52 and $392,761.80, respectively. The issues for decision are: (1) Whether petitioner properly deducted as ordinary and necessary business expenses amounts paid by him representing partnership organization and syndication costs; (2) whether the partnership may amortize organization and syndication expenses; and (3) whether management fee payments received by petitioner in excess of the amount provided in the partnership agreement represented loans.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, attached exhibits, and the supplemental stipulation of facts are incorporated by this reference.

Petitioners William T. and Harrylou Egolf,[1] husband and wife, timely filed joint Federal income tax returns for the taxable years 1978 and 1979 with the Internal Revenue Service Center at Austin, Texas. Petitioners filed an amended Federal income tax return (Form 1040X) for the taxable year 1979 on June 15, 1983. The Egolfs were residents of Oklahoma City, Oklahoma, at the time the petition was filed in this case.

Upon graduation from the University of Oklahoma in 1939, William T. Egolf (Egolf or petitioner) joined his father in the business of acquiring, developing, and operating oil and gas properties. He continued in this business after the

---

[1] Petitioner Harrylou Egolf is a party solely as the result of filing a joint Federal income tax return with petitioner William T. Egolf for the taxable years in issue. References to petitioner in the singular will refer to petitioner William T. Egolf.

death of his father in 1949. In 1969 he began organizing and promoting oil and gas drilling programs. In the course of this activity, he identified and obtained leases on several properties with the potential for the profitable production of oil and gas. Egolf then oversaw the drilling and the operation of the developed properties. He sponsored more than 30 such drilling programs between 1969 and 1984. Development of the properties acquired by Egolf was typically financed through the sale of limited partnership interests.

In the taxable year 1978, petitioner organized a drilling program that was financed by sales of limited partnership interests in Petroleum Investments, Ltd. - 1978 (hereinafter referred to as the 1978-Partnership). Although petitioner usually created a limited partnership to finance a single drilling program, three additional drilling programs were financed through additional subscriptions to the 1978-Partnership. The four drilling programs under the 1978-Partnership were designated as follows:

| Program | Date organized |
| --- | --- |
| Petroleum Investments, Ltd. - 1978 | Feb. 16, 1978 |
| Petroleum Investments, Ltd. - 1978A | Oct. 28, 1978 |
| Petroleum Investments, Ltd. - 1979 | May 21, 1979 |
| Petroleum Investments, Ltd. - 1979A | Oct. 1, 1979 |

A private placement memorandum was prepared for the initial solicitation of subscriptions to the 1978-Partnership and was supplemented for the subsequent solicitations for subscriptions used to finance the additional drilling programs.

Petitioner was the sole general partner of the 1978-Partnership. The limited partnership agreement of the 1978-Partnership (hereinafter referred to as the 1978-Partnership Agreement) provided that the agreement was to remain in effect for 20 years. The 1978-Partnership Agreement also provided that petitioner, as general partner, was to receive 10 percent of partnership revenue from oil and gas production. The remaining 90 percent of partnership revenue was to be shared among all partners in the ratio that each partner's subscription to the partnership bore to the total subscriptions. Because petitioner subscribed to the partnership individually, he was entitled to share in 90

percent of partnership revenue as a limited partner in addition to his 10-percent share as general partner.

The 1978-Partnership Agreement also provided that, in addition to his broad duties to acquire and oversee the development and operation of oil and gas properties for the drilling programs,[2] petitioner must bear all organization and syndication costs of the partnership. The 1978-Partnership Agreement provided:

### ARTICLE III

### *Business of the Partnership and Subscriptions*

\* \* \* \* \* \* \*

3.6 *Plan of Distribution.* Subscriptions and Additional Contributions shall be solicited on a "best efforts" basis by selected broker-dealers for commissions of 3% of amounts secured by them; provided, however, commissions shall be payable only upon amounts actually received by the Partnership at the time of such receipt. The General Partner shall bear all sales commissions. Subscriptions may also be solicited for the Partnership by William Egolf, but no commissions would be payable on sales made by him.

\* \* \* \* \* \* \*

### ARTICLE VI

### *Participation in Costs and Revenues*

6.1 *Costs.* All organizational and offering costs incurred in the offering and sale of Subscriptions and Additional Contributions, including sales commissions, shall be paid 100% by the General Partner. The General Partner shall also be charged with and shall bear 100% of all accounting costs, costs of preparing tax returns for the Partnership and operational overhead costs.

In addition, the offering circulars for the 1978-Partnership explicitly provided that the limited partner subscriptions would not be used for the organization and syndication expenses of the partnership. The offering circulars stated:

### APPLICATION OF PROCEEDS

Limited partner subscriptions will not be used for the payment of costs incurred in organizing the Partnership or selling Units therein, but instead will be used in conducting Partnership operations. \* \* \*

---

[2] It was anticipated that third parties would actually operate partnership wells under a contract with the partnership providing for the payment of a monthly per well fee. Petitioner was entitled to act as operator of partnership wells and to that extent was entitled to receive fees as a third party operator.

The 1978-Partnership Agreement summarized the division of costs and revenues between the general partner and limited partners as follows:

|  | Limited partners | General partner |
|---|---|---|
| Costs: | | |
| Offering costs | 0% | 100% |
| Accounting costs | 0 | 100 |
| Operational overhead costs[1] | 0 | 100 |
| Management and overall supervision fee | 100 | 0 |
| Acreage costs | 100 | 0 |
| Drilling costs | 100 | 0 |
| Completion costs | 100 | 0 |
| Equipment costs | 100 | 0 |
| Operating costs | 90 | 10 |
| Engineering reserve report | 90 | 0 |
| Revenues: | | |
| Oil and gas production | 90 | 10 |
| Sale of equipment and leases | 100 | 0 |
| Interest earned on partnership funds | 0 | 100 |

[1]These costs are reimbursed in part by the management and overall supervision fee.

The 1978-Partnership Agreement also provided that petitioner, as general partner, would receive a "Management and Overall Supervision Fee." The Amended 1978-Partnership Agreement described the management and overall supervision fee as follows:

4.2 *Compensation*. For his services in managing the Partnership, the General Partner shall be entitled to receive a Management and Overall Supervision Fee equal to 5% of all costs incurred in drilling, completing, testing and equipping Partnership wells, but excluding all costs of acreage acquisition and operating costs.

The 1978-Partnership Agreement does not reveal whether the management fee was to compensate or reimburse petitioner for organization and syndication expenses of the partnership. The private placement memoranda prepared as part of the solicitation of subscriptions to the 1978-Partnership do suggest that the management fee was intended to reimburse petitioner for costs of syndicating the partnership. Under the heading "Compensation" the memoranda described the management fee that the general

partner would receive. Also under this same heading is the following:

Sales commissions up to 3% may be paid to broker-dealers on the sale of interests in the Partnership. Any commissions payable shall be charged to the General Partner, and shall not be recharged to Limited Partners.

During the taxable years 1978 and 1979, petitioner incurred several expenditures in regard to the organization and syndication of the 1978-Partnership including the payments summarized below:

|  | 1978 | 1979 |
|---|---|---|
| Contractual payments in lieu of commissions | $65,000.00 | $50,000.00 |
| General partner's share arrangement | 22,685.19 | 22,933.84 |
| Commissions to brokers/ dealers | [1]178,938.78 | 475,196.90 |
| Legal and professional services fees | 26,690.00 | 26,560.00 |

[1]There is also included in the taxable year 1978 amount a payment of $5,745 made with respect to a prior partnership.

The "Legal and professional services fees" represent organization expenses of the 1978-Partnership. The other expenditures represent syndication costs incurred in the solicitation of subscriptions to the 1978-Partnership.

During the taxable years 1978 and 1979, petitioner received payments from the partnership as management fees in the amounts of $925,387.50 and $1,561,237.50. Because of inexact estimates of the costs incurred by the partnership to develop the oil and gas properties, the payments to petitioner throughout the taxable years 1978 and 1979 resulted in overpayments of the management fees in the amounts of $152,937.50 and $343,210.

No formal agreement describing these overpayments as loans, providing a repayment schedule, or establishing a firm due date was executed. Petitioner did not pledge any collateral or otherwise secure the repayment of these amounts to the 1978-Partnership. Nevertheless, petitioner did repay the overpayments with interest in 1982.

Petitioners prepared and appended to the Forms 1040 they filed for the taxable years 1978 and 1979 separate Schedules C, Profit or (Loss) From Business or Profession, reporting the main business activity of "Lease Management." On these Schedules C, petitioners reported the full

amount of payments received from the 1978-Partnership, including the overpayments, as "Management Fees." On the same schedules, petitioners claimed deductions for the amounts Egolf expended for organization and syndication expenses of the 1978-Partnership.

On the partnership income tax returns, prepared at the direction of petitioner and on behalf of the 1978-Partnership for the taxable years 1978 and 1979, deductions were claimed for the amount of the management fee paid to which petitioner was entitled under the 1978-Partnership Agreement. The 1978-Partnership did not claim a deduction for the amounts representing overpaid management fees, however, and reported the overpayments as amounts receivable from petitioner. For the taxable years 1978 and 1979, the 1978-Partnership did not separately deduct or capitalize any amounts as organization or syndication costs.

Egolf reviewed and signed petitioners' individual returns and the 1978-Partnership returns for the taxable years 1978 and 1979, despite the disparate treatment of the overpayments of management fees made to petitioner.

In the statutory notice of deficiency issued to petitioners for the taxable years 1978 and 1979, the Commissioner disallowed the deductions claimed for amounts expended by petitioner for organization costs of the 1978-Partnership in the amounts of $26,690 and $26,560, respectively. The Commissioner also disallowed deductions claimed by petitioners representing syndication costs of the 1978-Partnership in the amounts of $266,623.97 for the taxable year 1978 and $548,130.74 for the taxable year 1979.[3]

OPINION

*Treatment of Partnership Organization and Syndication Expenses and Management Fees*

The payments a partner receives from his ongoing partnership typically fall into one of three categories. A partner may receive payments representing a distribution of partnership income. A partner may also receive payments in his

---

[3] These adjustments in petitioners' taxable income changed the amount of the allowable depletion deduction for the taxable years in issue. The nature and calculation of these adjustments are not in dispute.

capacity as a partner that do not represent a distribution of partnership income. Sec. 707(c).[4] A partner may also receive payments in circumstances where he is not treated as a partner. Sec. 707(a). The differing nature of these payments has led to confusion over their tax consequences.

In *Cagle v. Commissioner*, 63 T.C. 86 (1974), affd. 539 F.2d 409 (5th Cir. 1976), this Court resolved some of the confusion that existed over the proper tax treatment of these different types of payments. We concluded that payments made to a partner either as guaranteed payments under section 707(c) or made to a partner in his capacity other than as a partner under section 707(a) must satisfy the requirements of section 162(a) before such payments may be currently deducted by the partnership. 63 T.C. at 91. As a result, no deduction is allowed if the payment by the partnership to a partner constitutes a capital expenditure. 63 T.C. at 95. Prior to *Cagle*, partnerships routinely claimed deductions for guaranteed payments made to a partner with the clear understanding that the payments would be used to pay organization and syndication expenses of the partnership, which could not be currently deducted under section 162. While agreeing with *Cagle*, Congress enacted section 709 as part of the Tax Reform Act of 1976, Pub. L. 94-455, sec. 213, 90 Stat. 1547-1549, to eliminate continued confusion surrounding the deductibility of payments made to a partner constituting guaranteed payments under section 707(c). Section 709 explicitly disallows a partnership from currently deducting partnership organization and syndication expenses whether paid directly or indirectly through payments to a partner. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 131-132; H. Rept. 94-658 (1976), 1976-3 C.B. (Vol. 2) 695, 812-814. Section 709 provides:

SEC. 709(a). GENERAL RULE.—Except as provided in subsection (b), no deduction shall be allowed under this chapter to the partnership or to any partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership.

(b) AMORTIZATION OF ORGANIZATION FEES.—

---

[4] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(1) DEDUCTION.—Amounts paid or incurred to organize a partnership may, at the election of the partnership (made in accordance with regulations prescribed by the Secretary), be treated as deferred expenses. Such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the partnership (beginning with the month in which the partnership begins business), or if the partnership is liquidated before the end of such 60-month period, such deferred expenses (to the extent not deducted under this section) may be deducted to the extent provided in section 165.

(2) ORGANIZATIONAL EXPENSES DEFINED.—The organizational expenses to which paragraph (1) applies, are expenditures which—

(A) are incident to the creation of the partnership;

(B) are chargeable to capital account; and

(C) are of a character which, if expended incident to the creation of a partnership having an ascertainable life, would be amortized over such life.

The regulations promulgated under section 709 define organization expenses to include: "Legal fees for services incident to the organization of the partnership, such as negotiation and preparation of a partnership agreement; accounting fees for services incident to the organization of the partnership; and filing fees." Sec. 1.709-2(a), Income Tax Regs.[5] The same regulations define syndication expenses as expenses connected with the issuing and marketing of interests in the partnership. Sec. 1.709-2(b), Income Tax Regs. Syndication expenses are not a category of organization expense. Sec. 1.709-2(a), Income Tax Regs.

The 1978-Partnership Agreement before us was structured in an attempt to avoid the strictures of section 709. Instead of directly bearing nondeductible capital costs of organization and syndication, the 1978-Partnership Agreement required petitioner, as general partner, to bear these costs. The 1978-Partnership reimbursed petitioner for his services to the partnership, including organization and syndication costs, with the management fee, for which it claimed a current deduction. Petitioners then reported the entire amount of the management fee as ordinary income. To complete the circle, petitioners claimed a deduction under section 162 for all of the organization and syndication costs incurred by Egolf on behalf of the 1978-Partnership as

---

[5] Sec. 1.709-1, Income Tax Regs., is generally effective for partnership taxable years beginning after Dec. 31, 1975. Sec. 1.709-1(a), Income Tax Regs.

an expense of petitioner's trade or business of organizing drilling program limited partnerships.

If we were to respect the form of the above transactions, the 1978-Partnership would have succeeded in currently deducting organization and syndication costs by indirectly paying them to petitioner under the guise of management fees. Further, the transaction would have had no ill effects on petitioners. The management fee income they reported representing reimbursement for the organization and syndication costs of the 1978-Partnership would have been offset by deductions for legal fees and commissions incurred in organizing and syndicating interests in the partnership. Such a result would circumvent the letter and intent of section 709.

In applying section 709 to the instant case, we are constrained to consider the substance of the management fees and not their form. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Brountas v. Commissioner*, 73 T.C. 491, 582 (1979), revd. on other grounds 692 F.2d 152 (lst Cir. 1982), cert. denied 462 U.S. 1106 (1983). To determine whether a portion of the management fees paid to petitioner represent organization or syndication costs of the partnership, "we look to the nature of the services performed [for which the fees were paid] * * * rather than to their designation or treatment by the partnership." *Estate of Boyd v. Commissioner*, 76 T.C. 646, 658 (1981) (quoting *Cagle v. Commissioner*, *supra* at 96). Our scrutiny of the management fees paid by the partnership to petitioner reveals that they are, in part, reimbursements for organization and syndication costs. Petitioner and his agents repeatedly conceded this much at trial and on brief.

Based upon our conclusion that the management fees represent, in part, reimbursement for partnership organization and syndication expenses, the deduction claimed by the partnership for the taxable years 1978 and 1979 must be reduced by the amount representing organization and syndication fees. Sec. 709(a).[6] The amount of ordinary income

---

[6] We recognize that the correct 1978-Partnership income was not raised as an issue by the parties. Nonetheless, as petitioner's distributive share of partnership income must be considered in our redetermination of petitioners' correct tax liability, the correct partnership taxable income is placed at issue.

reported by petitioners as management fees from the 1978-Partnership for the taxable years in issue must be reduced by a like amount because the management fees, to such extent, were reimbursements, not compensation for services rendered. Accordingly, the deductions claimed as attorney's fees and commissions that represented reimbursements for organization and syndication expenses of the partnership must be disallowed. Because petitioners have failed to prove that the amounts of the adjustments to petitioners' allowable deductions determined by the Commissioner in the notice of deficiency were in error (*Johnsen v. Commissioner*, 83 T.C. 103, 129 (1984); *Flowers v. Commissioner*, 80 T.C. 914, 943 (1983); Rule 142(a)) those amounts will also govern the adjustment to the income of petitioner from management fees and the extent of the management fee deduction the partnership will be allowed.

The partnership agreement was carefully drafted to disguise the payment of nondeductible organization and syndication costs by the partnership as currently deductible management fees. Viewing the substance of the agreement, we cannot allow the form selected for the transactions between petitioner and the partnership to govern for tax purposes. Moreover, the result we reach is confirmed by an analysis of petitioners' argument that Egolf was acting independently of his capacity as a partner in the 1978-Partnership when he incurred the organization and syndication costs of the partnership.

Petitioners contend that Egolf was in the separate trade or business of organizing and managing drilling program limited partnerships. As such, the management fee he received from the 1978-Partnership represented income from this trade or business. Furthermore, petitioners argue that since Egolf was acting other than in his capacity as a partner under section 707(a) when he incurred the organization and syndication costs, the prohibition of the deduction of such costs in section 709(a) is inapplicable to him. Despite whatever merit this argument may otherwise have, petitioners have failed to meet their burden of proof with respect to a critical element of their argument (*Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a)) that Egolf was

not acting in his capacity as a partner of the 1978-Partnership.

Petitioners argue that in receiving the management fees from the partnership and, in turn, paying out commissions on the sale of interests in the partnership and attorney's fees for assistance in organizing the partnership Egolf was acting in a role analogous to an independent broker-dealer. In support of this argument petitioners emphasize that Egolf has performed these services for partnerships formed by him since 1969 and that the payment of these costs was not an isolated occurrence. Although petitioners' argument has some allure when viewed from this perspective, the totality of the facts and circumstances in this case leave us convinced that Egolf was acting as a partner when he incurred the organization and syndication costs on behalf of the partnership. See *Pratt v. Commissioner*, 64 T.C. 203, 212 (1975), affd. in part, revd. and remanded in part 550 F.2d 1023 (5th Cir. 1977).

Petitioner not only received a management fee, but also had a general partnership interest in every drilling program limited partnership he promoted. Furthermore, the obligation to pay the organization and syndication costs of the partnership was not found in a separately executed contract, but rather arose from the partnership agreement. The partnership agreement failed to provide a clear delineation of petitioner's duties as a managing general partner and his alleged role as an independent broker-dealer. Lastly, petitioner was not a licensed broker-dealer during the taxable years in issue. Based upon the facts before us, petitioners' analogy of Egolf's activities to those of an independent broker-dealer is unpersuasive.

It seems clear that the various other duties required of petitioner by the partnership agreement, such as supervising the drilling, completion, and equipping of the wells drilled by the partnership and overseeing their subsequent operation, are so closely associated with the business of the partnership that he was acting as a partner with respect to those activities. *Pratt v. Commissioner*, 64 T.C. at 211.[7]

---

[7] However, to the extent, if any, that petitioner acted as the operator of partnership wells, *supra* note 2, we would likely find that he was not acting in his capacity as a partner of the 1978-Partnership. Cf. *Wegener v. Commissioner*, 119 F.2d 49, 51 (5th Cir. 1941), affg. 41

Petitioner was, after all, the sole general partner of a limited partnership. As such, petitioner alone could perform the various managerial functions on behalf of the partnership. Although none of these factors is determinative standing alone, we find that together they confirm our finding that when performing the services for which he received the management fee, including the payment of organization and syndication costs, petitioner was acting in his capacity as a partner. Because the prohibition found in section 709(a) applies both to a partnership and to any partner, the deductions claimed by petitioners which represented organization and syndication of the 1978-Partnership were properly disallowed. Sec. 709(a).

### *Amortization of Organization and Syndication Expenses*

Having concluded that the 1978-Partnership may not currently deduct that portion of the management fees paid to petitioner representing reimbursement for the payment of organization and syndication expenses of the partnership, we must address petitioners' alternative argument that organization and syndication expenses of the partnership may be capitalized and amortized under section 167.

Section 709(a) provides that, except as provided in section 709(b), no deduction is allowed "under this chapter" for partnership organization and syndication expenses.[8] The "chapter" referred to in section 709(a) is "Chapter 1, Normal Taxes and Surtaxes, Subtitle A, Income Taxes," of the Internal Revenue Code of 1954. This chapter encompasses section 167, which allows a deduction for depreciation or amortization of property used in a trade or business or held for the production of income. Therefore, section 709(a) clearly precludes amortization of partnership organization and syndication expenses under section 167. Cf. *Estate of Thomas*, 84 T.C. 412, 440-444 (1985) (amortization of partnership syndication expenses disallowed under law prior to the effective date of section 709). Because petitioners do not contend that an election was properly made by

---

B.T.A. 857 (1940), cert. denied 314 U.S. 643 (1941) (decided prior to the enactment of Subchapter K, I.R.C. 1954).

[8] Pursuant to sec. 709(b), organizational, but not syndication, expenses, may, if properly elected, be amortized over a period not less than 60 months.

the partnership, no amortization of partnership organization expenses is allowable under section 709(b).

## Management Fee Overpayments as Loans

The last issue before us is whether the 1978-Partnership's management fee overpayments to petitioner are properly characterized as loans or income.

Petitioners claim that management fee overpayments received by Egolf and erroneously reported as income were actually loans to him by the 1978-Partnership. As a result, petitioners seek to exclude from their income for the taxable years 1978 and 1979 the amounts of these overpayments. Respondent maintains that the overpayments were income to Egolf and were properly reported as such by petitioners.

The intention of the parties is the controlling factor in determining whether or not payments are actually considered loans. *Berthold v. Commissioner*, 404 F.2d 119 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; *Miele v. Commissioner*, 56 T.C. 556, 567 (1971), affd. without published opinion 474 F.2d 1338 (3d Cir. 1973), cert. denied 414 U.S. 826 (1973). The intention of the parties relates not so much as to the name or form of the transaction as it does to an actual intent that the advance will be repaid. *Commissioner v. Makransky*, 321 F.2d 598 (3d Cir. 1963). The intention of the parties as to the characterization of the overpayments is a factual question to be decided based upon all the facts and circumstances before us. *Miele v. Commissioner*, 56 T.C. at 567. Petitioners have the burden of proving that the management fee overpayments are actually loans from the 1978-Partnership. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a).

Based upon our consideration of all the facts and circumstances, we conclude that petitioners have failed to carry their burden of proving that the parties intended the overpayments as loans. Important to petitioners' failure to meet their burden of proof was the absence of provisions for adequate security, interest, and repayment of the overpayments. Such objective indicia are persuasive that a loan was intended, although not necessarily compelling. *Berthold v. Commissioner*, 404 F.2d at 122; *Miele v. Commissioner*, 56 T.C. at 568-569; *White v. Commissioner*, 17 T.C. 1562, 1569

(1952). We take note of the fact that there was no provision in the partnership agreement requiring petitioner to repay excess management fee payments. We also do not find that the partnership's accounting treatment of the overpayments as amounts receivable from petitioner deserves great weight in our decision, particularly in light of the inconsistent treatment of these amounts by petitioners on their individual returns. Lastly, the fact that petitioner ultimately repaid the advances in 1982 is of limited use in determining what the parties intended when the overpayments occurred.

Petititioner, a cash basis taxpayer, received the management fee under a claim of right and was not restricted in the use of the funds and must, therefore, include the entire amount of the payments in taxable income in the years received. *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424 (1932); *Corliss v. Bowers*, 281 U.S. 376 (1930). Petitioner was given the right to receive management fees under the partnership agreement. That the management fees received exceeded the amount to which he was entitled because of an inexact estimation of the correct amount or simply by mistake does not change the result, even if he was under an obligation to repay the overpayments in a later taxable period. *United States v. Lewis*, 340 U.S. 590, 591 (1951); *Commissioner v. Gaddy*, 344 F.2d 460, 462 (5th Cir. 1965); *United States v. Merrill*, 211 F.2d 297, 303 (9th Cir. 1954).

Our finding that petitioner held the full amount of the management fee, including the overpayments, under a claim of right is confirmed by the actions of petitioner individually and on behalf of the partnership. Petitioner, as general partner, was responsible for maintaining the partnership's books and records. Despite the fact that the overpayments were discovered shortly after the close of the taxable years in issue, the partnership made no effort to induce petitioner to repay the overpayments. Petitioner reported the overpayments as income and had unfettered control over those amounts for approximately 5 years. In this connection, we point out that petitioners filed an amended joint Federal income tax return for the taxable year 1979 in June 1983, long after the discovery of the overpayments and after their repayment. Petitioners did not seek to reduce their taxable

income by the amount of the overpayments on the amended return. On the whole, we are convinced that petitioner treated the overpayments as his rightful property for several years. Petitioner failed to adequately renounce his right to the overpayments in the years received and the amount of the overpayments must be included in petitioners' taxable income. *Commissioner v. Gaddy, supra; United States v. Merrill, supra* at 303-304.

Although petitioners must include the overpayments in their taxable income for the taxable years before us, they may be able to deduct the subsequent repayments in the taxable year they are repaid. *United States v. Lewis, supra.* Provided the period of limitations has not expired for the year of repayment, petitioners may be entitled to a refund of tax paid and to utilize section 1341 to obtain the full benefit of the deduction allowed because of the repayment.

*Decision will be entered under Rule 155.*