THOMAS M. VERTIN AND DIANE L. VERTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vertin v. Commissioner
Docket No. 44625-85.
United States Tax Court
T.C. Memo 1987-161; 1987 Tax Ct. Memo LEXIS 157; 53 T.C.M. (CCH) 435; T.C.M. (RIA) 87161; March 25, 1987. Richard E. T. Smith, for petitioners. Genelle Forsberg, for respondent. DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: This case was assigned pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2755) of the Code and Rules 180, 181 and 182. [1] For convenience and clarity, the findings of fact and conclusions of law have been combined in this opinion. *159 Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1975
$1,498.78
1976
74.00
1978
133.08
1979
1,552.08
1980
2,258.84
When this case was called for trial, the parties filed a Stipulation of Agreed Adjustments in which they disposed of all issues for the years 1975 through 1979; all issues for the year 1980, except two, were also disposed of by concessions. The only issues remaining for decision are (1) whether petitioners' allocable share of $22,000 in fees paid by Midwest Investing Associates I (Midwest) to Gary Valeska, an accountant, in 1980, is currently deductible, and (2) whether petitioners' allocable share of $50,000 paid by Midwest to Schomac Corporation as consideration for a risk limitation agreement is currently deductible or is required to be capitalized. Petitioners resided in Breckenridge, Minnesota, at the time they filed their petition. In 1980, they became a one percent partner in Midwest. In May, 1980, Midwest was formed to invest in real estate and to obtain rental income therefrom. [2] On September 29, 1980, Midwest acquired a 15 percent interest in Golf Links-Pantano Associates *160 (Golf-Links), a limited partnership located in Tucson, Arizona. On December 1, 1980, Midwest acquired an interest in Fountain Plaza Partners (Fountain Plaza), another limited partnership located in Tucson, Arizona. At trial, petitioners introduced into evidence the testimony of Gary Valeska (Valeska), [3] a certified public accountant who managed Midwest. He testified that in 1980, Midwest had also acquired an interest in Westwood Office Park (Westwood), a partnership located in Wahpeton, North Dakota. The record clearly shows, however, that Midwest did not acquire an interest in Westwood before 1981. On its 1980 partnership return, Midwest deducted $11,000 as an "asset management fee" and $11,000 as an "investment advisory *161 fee." The total amount of $22,000 was paid to Valeska. [4] Respondent disallowed those deductions on the ground that they are nondeductible organizational costs. Alternatively, respondent argues that the fees are not deductible because Midwest was not in a trade or business in 1980. Petitioners, predictably, contend that the fees are deductible either as trade or business expenses pursuant to section 162, start-up expenses pursuant to section 195, or expenses incurred for the production of income pursuant to section 212. Deductions are strictly a matter of legislative grace and a taxpayer has the burden of establishing that he is entitled to any deduction claimed on his return. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Rule 142(a). We have previously found, supra, that Midwest did not acquire an interest in Westwood prior to 1981. On September 29, 1980, Midwest acquired a 15-percent interest in Golf-Links. Golf-Links is a tract of land of approximately 52 acres located at the corner *162 of Golf-Links Street and Pantana Street in Tucson, Arizona. When Golf-Links was formed in 1978, it was anticipated that some of the 52 acres would be sold and a 310-unit apartment complex would be developed on the remaining acreage. There is no evidence that any of the acreage had been sold or that the development of an apartment complex had begun up to the time of trial. Clearly, Midwest was not engaged in a trade or business in 1980 through its interest in Golf-Links. Valeska testified that Midwest incurred no start-up costs in 1980 pertaining to Golf-Links. On December 1, 1980, Midwest became a limited partner in Fountain Plaza. Fountain Plaza was built in 1974 and consisted of 180 apartment units and 18 motel units. In 1980, it was an active business. [5] During the month of December 1980, therefore, Midwest was engaged in carrying on a trade or business within the intendment of section 162(a) because, on that date, through its investment in Fountain Plaza, it began to perform those activities for which it was organized. Richmond Television Corp. v. United States,345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other grounds 382 U.S. 68 (1965) *163 (per curiam).
Section 162 provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Expenses incurred prior to the establishment of a business normally are not currently deductible since they are not incurred in carrying on a trade or business. See Goodwin v. Commissioner,75 T.C. 424, 433 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982), and cases there cited. The $11,000 "Asset Management" fee and the $11,000 "Investment Advisory" fee were paid to Valeska by Midwest on September 29, 1980 by a single check in the amount of $22,000. Valeska maintained a time and billing record to reflect his charges against the $11,000 asset management fee. An examination of that record shows that the asset management fee was used to pay Valeska for organizational services performed by him for Midwest prior to December 1, 1980. Included in the *164 time and billing record were charges for such services as the preparation of the partnership agreement, revision of the partnership agreement and preparation of the partnership prospectus. Section 709(a) provides as a general rule that no deduction shall be allowed to a partnership or to any partner for any organization or syndication fees. Section 709(b) provides an exception to the general rule for organization fees (but not syndication fees). Organization fees may, attheelectionofthepartnership, be amortized over a period of not less than 60 months. Here, Midwest did not elect to amortize its organization fees under section 709(b). Accordingly, that part of the "asset management fee" that represents organization and syndication fees is not deductible. Section 709(a); Driggs v. Commissioner,87 T.C. 759, 777-778 (1986); Egolf v. Commissioner,87 T.C. 34 (1986). The record also shows that Valeska charged the asset management fee for services performed by him for partnerships other than Midwest, e.g., Westwood and a partnership *165 known as Prairie Associates. In 1980, Valeska was the manager of three partnerships, one of which was Midwest. The three partnerships, in turn, invested in approximately 10 other partnerships. Valeska, therefore, was actively involved in approximately 13 partnerships. He was also indirectly involved in another 12 or so partnerships. Most of those persons who invested in the three partnerships managed by Valeska were individual clients of Valeska. Some of the charges made by Valeska against the asset management fee were for services rendered by him to, or for the benefit of, partnerships other than Midwest. As we have noted, fn. 2, supra, the Midwest partnership agreement is not in evidence and petitioners have completely failed to show that any part of the asset management fee paid to Valeska for services rendered to, or for the benefit of, other partnerships, constitutes an ordinary and necessary expense incurred by Midwest in the conduct of its trade or business. See Cropland Chemical Corp. v. Commissioner,75 T.C. 288 (1980), affd. without published opinion 665 F.2d 1050 (7th Cir. 1981). We find that Midwest was not entitled to deduct *166 any part of the asset management fee on its 1980 partnership return. [6]
As we have noted, supra, Midwest paid Valeska an $11,000 investment advisory fee on September 29, 1980. Valeska kept no books or records to account for the services rendered by him to earn the investment advisory fee. When asked at trial what he did to earn the investment advisory fee, he responded that the fee actually involved a number of things. Valeska, on a yearly basis, prepares a report called "a Historical Track Record" (report) for each of his clients who have invested in the various partnerships managed by him. Those records list all the projects in which his client invested; it shows the amounts invested by his client in each of the projects and his tax savings, assuming that he is in the 45 percent tax bracket. It shows cash distributed after investment returns, the taxable gain on sales, the tax effect *167 of the gains and the client's effective return after taxes. In addition, he also gives advice to his clients, not only on the investments they have already made, but also with regard to other investments that they are considering. Valeska does not bill his clients separately for these services. We can only conclude that the investment advisory fee constitutes a type of community cookie jar from which funds are paid to Valeska to compensate him for services rendered to his individual clients, regardless of the indentity of the projects in which they had already invested or in which they intend to invest. Petitioners have failed to prove that the $11,000 investment advisory fee paid to Valeska is an ordinary and necessary business expense incurred by Midwest in the conduct of its trade or business in 1980. Cropland Chemical Corp. v. Commissioner,supra.Respondent's disallowance of this claimed expense is sustained. [7]
When Midwest invested in Fountain Plaza on December 1, 1980, purportedly for the purpose of acquiring an 80 percent interest therein, its capital contribution was entirely in the form of a promissory note in the amount *168 of $1,560,000, to be paid in installments as follows: $390,000 on or before December 31, 1980 128,600 on or before February 1, 1981 756,400 on or before June 1, 1981 100,000 on or before June 1, 1982 100,000 on or before June 1, 1983, and 85,000 on or before June 1, 1984 On the same date, December 1, 1980, Midwest entered into an agreement with the Schomac Corporation (Schomac), an Arizona corporation controlled by the same individuals who controlled Fountain Plaza. The agreement was entitled "Agreement of Risk Limitation by Right to Assign Partnership Interest (the agreement). The agreement noted that Midwest had delivered its promissory note to Fountain Plaza in the amount of $1,560,000. The agreement further noted that "Midwest desires to limit its risk that due to unforseen circumstances it may not be able to pay the installments required by the Note." The agreement further provided: 1.4 Schomac and Midwest have agreed that pursuant to the terms of this Agreement, Midwest may transfer to Schomac its Partnership Interest in the Partnership and its obligations under the Note. 2. Right to Assign Partnership Interest and Note Obligations
*169 2.1 Subject to the terms and conditions herein contained, Schomac hereby grants to Midwest the absolute and unconditional right to assign to Schomac all of the interest of Midwest in the Partnership and to transfer to Schomac all of Midwest's obligations remaining unpaid under the Note (the "Right of Assignment"). 2.2 Provided that Midwest is not in default under the Note, Midwest may exercise the Right of Assignment only by delivering written notice of its intention to do so thirty (30) days prior to the date upon which assignment is to become effective. If Midwest has not caused an assignment to be made pursuant to the terms of this Agreement by June 1, 1981, the Right of Assignment of Midwest hereunder shall automatically terminate and become completely null and void. 2.3 Upon the receipt by Schomac of the Notice of Assignment as provided for herein, the following shall automatically occur without further action: 2.3.1 Title to the interest of Midwest in the Partnership shall automatically vest in Schomac; 2.3.2 Schomac shall be obligated to pay to Midwest eighty percent (80%) of the amount previously paid by Midwest pursuant to the Note. Said payment by Schomac shall *170 be made by Schomac to Midwest on or before eighteen (18) months from the date upon which the Notice of Assignment becomes effective. From the date upon which the Notice of Assignment became effective, the amount owing by Schomac by reason of said Assignment shall accrue interest at the rate of twelve percent (12%) per annum. All accrued interest shall be paid at the end of each calendar quarter. 2.3.3 Schomac shall be deemed to have assumed the unpaid balance of the Note. Schomac shall thereafter hold Midwest harmless from any action to collect under the Note. 3. Consideration to Schomac
In order to induce Schomac to enter into this Agreement, Midwest does hereby agree to pay Schomac the sum of Fifty Thousand and NO/100 Dollars ($50,000) as full consideration for Schomac's undertaking the obligations and duties created by this Agreement. On its 1980 partnership return, Midwest deducted $8,333 as an amortization expense, which amount is one-sixth of $50,000. Petitioners contend that Midwest may amortize $50,000 over a six month period under the terms of the agreement. Because Midwest is on an accrual basis, petitioners argue that the six-month amortization period should *171 begin on December 1, 1980. The six-month amortization period determined by petitioners is premised on the provisions of the agreement, paragraph 2.2, which provided that if Midwest is not in default on its December 1, 1980, note to Schomac, Midwest may exercise its right of assignment to Schomac by delivering written notice of its intention to do so thirty (30) days prior to the date upon which assignment is to become effective. If Midwest has not caused an assignment to be made pursuant to the terms of the Agreement by June 1, 1981, the Right of Assignment of Midwest was to automatically terminate and become completely null and void. Respondent contends that if Midwest did have an obligation to pay $50,000 pursuant to the agreement, that amount is part of the amount Midwest paid to purchase its interest in Fountain Plaza. For the reasons stated, infra, we agree with respondent. Valeska testified that the agreement was entered into between Midwest and Schomac in order to protect $600,000 that had been invested in Fountain Plaza by the limited partners in Midwest. He stated that Midwest was having trouble raising the required capital to pay the note and that the agreement *172 was designed to protect Midwest from losing its investment in Fountain Plaza by default. The record clearly shows that Valeska's testimony was apocryphal. The record in this case presents a completely different scenario from that testified to by Valeska. The record shows that, on December 1, 1980, Midwest did not have $600,000 invested in Fountain Plaza and we reject Valeska's testimony as to the substance of the transaction. Contrary to Valeska's testimony at trial, we are able to find the following facts upon our perusal of the record. Valeska testified that Midwest wished to purchase an 80 percent interest in Fountain Plaza, on December 1, 1980, for $1,560,000. He further testified that Midwest paid $390,000 to Fountain Plaza in December 1980, and $128,600 on February 1, 1981. No documentation was offered to substantiate Valeska's testimony about the December 1980 and the February 1981 payments. Valeska also testified that, in 1980, prior to Midwest's investment in Fountain Plaza, Midwest had invested $500,000 in Golf-Links; Midwest anticipated an additional capital call from Golf-Links of approximately $300,000 and the limited partners in Midwest contributed to the partnership *173 the $300,000. In November 1980, however, it became apparent that Golf-Links would not make a capital call for $300,000. Valeska testified, therefore, that Midwest had $300,000 available to either refund to the limited partners or invest in another enterprise. It was determined that the limited partners did not want a refund of their contributions but preferred to invest in Fountain Plaza. If Valeska's testimony were true, Midwest's partnership return for 1980, would have reported investments in other partnerships of $890,000, i.e., $500,000 invested in Golf-Links and $390,000 invested in Fountain Plaza. Midwest's return for 1980, however, reported investments in other partnerships in the amount of $582,033. We also note that Midwest's 1981 partnership return was not offered in evidence and there is nothing in the record to corroborate Valeska's testimony that Midwest paid Fountain Plaza $128,600 on February 1, 1981. We will not further extend our review of the many apparent contradictions between Valeska's testimony and the documentary evidence in the record. When Midwest invested in Fountain Plaza in December 1980, it knew, or should have known, that it would not have the *174 cash flow from its investments necessary to meet its obligations on the December 1, 1980, note issued to Fountain Plaza. All of Midwest's limited partners had fulfilled their capital contribution obligations to Midwest. In May 1981, Midwest informed Schomac that it could not meet its June 1, 1981 obligation to pay Fountain Plaza the $756,400 due on its note of December 1, 1980. Schomac then, allegedly, assumed Midwest's obligations on the note. As a consequence, Midwest would up with a 31 percent, rather than an 80 percent interest in Fountain Plaza. Interestingly enough, Schomac obtained the money necessary to meet Midwest's obligations on its December 1, 1980, note to Fountain Plaza by selling interests in Fountain Plaza to most of the original partners of Midwest. Since Schomac was able to obtain additional monies from the original partners of Midwest to make the payments on Midwest's note of December 1, 1981, to Fountain Plaza, we are at a loss to understand why Midwest could not have done the same thing in order to acquire the money necessary to make the payments on its note. There is also no evidence to show that, upon the notice of assignment by Midwest to Schomac, title *175 to the interest of Midwest in Fountain Plaza automatically invested in Schomac pursuant to paragraph 2.3.1 of the Agreement. There was also no evidence that Schomac paid to Midwest 80 percent of the amount previously paid by Midwest to Fountain Plaza pursuant to paragraph 2.3.2 of the Agreement. We are compelled to conclude that the agreement between Midwest and Schomac was a transparent sham. It is clear from this record that the $50,000 payment was an ancillary amount paid to acquire 31 percent of Fountain Plaza. It is well-settled that amounts expended to acquire a capital asset must be capitalized and cannot be deducted as a business expense or an expense incurred for the management, conservation or maintenance of property. Woodward v. Commissioner,397 U.S. 572, 575 (1970); 5 Mertens, Law of Federal Income Taxation, sec. 25.39 (1987). Respondent has determined that the $50,000 paid by Midwest to Schomac pursuant to the agreement, supra, was a part of the price that Midwest paid to acquire its 31 percent interest in Fountain Plaza. Petitioners have not proved *176 otherwise. Welch v. Helvering,290 U.S. 111 (1933). We find for respondent on this issue. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Neither party offered into evidence the Midwest partnership agreement and it is not, therefore, a part of the record.↩
3. Valeska testified that he did not invest in any of the partnerships that he managed. The only income he received from the various partnerships he managed, including Midwest, were fees for services rendered. Various documents introduced into evidence show that Valeska represented that he was the managing partner of Midwest.↩
4. Valeska prepared Midwest's 1980 partnership return.↩
5. Valeska testified that Midwest incurred no start-up costs during 1980 relating to its investment in Fountain Plaza.↩
6. We note that sections 162 and 212↩ share the common requirement that an expense be "ordinary and necessary" in order to be deductible. It is this requirement, and the partnership's failure to satisfy it, that makes petitioners' contentions (both primary and alternative) untenable.
7. See footnote 6.↩